The Chicago, Bloomington and Decatur Railway

*v.*

Cora Kelly *et al.*

*Opinion filed April 17, 1906—Rehearing denied June 7, 1906.*

1. Evidence—*what does not establish parol assignment of homestead and dower.* An understanding between the surviving husband and his daughters that he was to reside on the home place during his lifetime and receive the rents therefor, while each daughter was to receive the rent from other properties, is merely an arrangement for division of the rents and does not amount to a parol assignment of dower and homestead, particularly where the husband pays the taxes on all the property and keeps up the repairs at his own expense:

2. Eminent domain—*when damage to leasehold cannot be allowed.* A surviving husband or wife cannot sell, convey or lease dower or homestead rights to a stranger to the title before dower and homestead has been set off and assigned, and damages cannot be allowed in condemnation to a stranger holding a lease executed under those circumstances.

3. Same—*when question is properly ruled out.* Where a witness for the defendant in condemnation has testified that the land was worth $150 per acre before the construction of the railroad and would be worth $105 or $110 per acre afterwards, it is not error, on cross-examination, after he has stated that the land would be worth less with the railroad through it than before, to refuse to allow the question, "How much less do you say?" since it would merely require the witness to repeat what he had already stated.

4. Same—*what divided farm will sell for in separate tracts is not material.* Where a witness for the defendant in condemnation has testified to the damage to lands not taken, it is proper to refuse to permit him to be cross-questioned as to whether the tracts of land as divided by the railroad would not sell as separate fields for more than he had stated they would be worth.

5. Same—*what is not proper cross-examination.* Where a witness for the defendants in condemnation testifies that there was a good well on the land which the railroad would cut off from another part of the land, and states, on cross-examination, that the well was about ten feet deep, in a low place, and that a good well-digger could dig it in half a day, the further question whether or not there were other low places on the land is properly disallowed, as not being proper cross-examination.

6. Same—*what price a particular person will give for land is not competent.* In condemnation of farm land for a railroad right of way, evidence offered by the petitioner to show that one witness testifying in its behalf was financially able to buy the land and what he would be willing to pay for the same after the construction of the railroad is properly excluded, but such witness may testify, as other witnesses, upon the question of value.

7. Same—*consideration of elements of damage should be limited to their effect upon market value.* An instruction stating what elements of damage the jury are entitled to consider in determining the damages to land not actually taken for railroad right of way, should limit the consideration of such elements to the extent to which they enter into and affect the market value of the land, and not as independent matters.

Appeal from the County Court of DeWitt county; the Hon. Fred C. Hill, Judge, presiding.

Lemon & Lemon, for appellant.

John Fuller, Ingham & Ingham, L. R. Herrick, and E. J. Sweeney, for appellees.

Mr. Justice Boggs delivered the opinion of the court:

This is a proceeding by the appellant, under the Eminent Domain law, to acquire the right of way for its road. There are three principal defendants, viz., Cora Kelly, Emma A. Kelly and James P. Dooley. Cora Kelly was the owner of a tract of sixty-four acres, Emma A. Kelly of a tract of about thirty-five acres, and James P. Dooley claimed a leasehold interest in another tract of about two and one-half acres. The petitioner sought to condemn a strip fifty feet in width across the two Kelly tracts, the amount of land desired from the first named tract being 2.32 acres, that of the second named tract 1.64 acres, and that taken from the two and one-half acre tract .23 of an acre. Cora Kelly was the owner of the first named tract absolutely. Emma Kelly owned the second tract subject to a mortgage of $2300 in favor of the

appellee Sallie A. Porter. As to the two and one-half acre
tract, it was owned by the surviving husband and heirs of
one Mary Welsh, viz., Richard Welsh, the surviving hus-
band, who was entitled to a homestead therein and dower in
the residue, and Margaret Coffey and Anna Dooley, wife of
the appellee James P. Dooley, they being the only surviving
heirs-at-law of the said Mary Welsh, deceased. As to that
tract appellant received from the husband and heirs a deed
for the right of way in consideration of $300. At the com-
mencement of the suit there appeared of record what pur-
ported to be a lease from the said surviving husband, Richard
Welsh, to the appellee James P. Dooley, upon the two and
one-half acre piece. Said lease on its face states the term
thereof to be from March 1, 1905, to March 1, 1910, but the
appellee Dooley being a railroad conductor, the lease con-
tained the following stipulation: "Should the said James
Dooley be compelled to change his location that event shall
terminate this lease." No proceedings in court had ever
been had for the assignment of the homestead and dower of
the said Richard Welsh in and to said two and one-half acre
tract, neither had there been any partition or assignment
thereof by conveyances, but on a hearing before the judge
preliminary to the hearing for the assessment of damages it
was claimed by the defendant Dooley that by reason of an
alleged oral partition and assignment of homestead and
dower his lease conferred upon him a leasehold interest in
the premises for the term of five years, as therein specified,
which the court held as a matter of law and fact, to which
the appellant excepted. The appellees the Kellys each filed
cross-petitions alleging damages to the land not to be taken,
and the appellee Dooley also filed a cross-petition alleging
damages to that portion of the leasehold premises not to be
taken. After a hearing the jury returned the following ver-
dicts: To appellee Dooley, as damages for the rental value
of the land to be taken, $36, and as damages to rental value
of the remainder of land not taken, $270; to Cora Kelly, for

fair cash value of lands taken, $348, and as damages to the remainder of her land not taken, $1853; to Emma A. Kelly, for cash value of land taken, $246, and as damages to lands not taken, $1191.75. Judgments were entered upon the verdicts, and this is an appeal to bring the judgments into review in this court.

The appellant company concedes that a parol assignment of dower and homestead may be made by the parties in interest, but denies the contention of the appellee Dooley that the evidence introduced on the hearing was sufficient to establish such parol assignment, and insists that because no legal assignment of dower and homestead was made to said Richard Welsh, the lease made by him to said Dooley, a stranger to the title, was of no force and effect.

Briefly stated, the facts are, that one Mary Welsh departed this life in the year 1901, intestate, leaving Richard Welsh, her husband, and Mrs. Anna Dooley and Mrs. Margaret Coffey as her only children and heirs-at-law. At the time of her death she was the owner in fee of the land here claimed to have been leased to appellee Dooley, and also of three lots on Washington street, in the city of Clinton, upon each of which lots, including that claimed to have been leased, was a dwelling house. At the time of her death said Mary Welsh, together with her husband, lived in the dwelling on the premises claimed to have been leased.

On the question of parol assignment of dower and homestead, Richard Welsh, husband of the said deceased and the party claimed to have made the alleged lease, testified: "There was an agreement between myself and my daughter as to the property left by my wife. In the first place, she left everything to me,—the real estate. We agreed for me to have the homestead as long as I lived. Then we agreed to let Mrs. Coffey have the rent of one house on Washington street, Mrs. Dooley the rent of the other house, and I took the smaller one. I paid the taxes from that day up to now, on all of the property, and kept them in repair and built side-

walks and everything on those houses on Washington street. I was to have the homestead as long as I lived. We divided up the three houses on Washington street,—have each a little house apiece. I did not tell Mrs. Coffey she could have that house for her property. I could not do that. It was not set aside by the court. It was by agreement. I did not tell Mrs. Dooley she could have the other house,—only the rent,—and that Mrs. Coffey could have the rent of the other house, because the whole estate was left to me as long as I lived. My wife left the properties, as I understand it, to me during my life. No one had more right to it than me. My wife left no written will. I told Mrs. Dooley she could have the rent of one of the houses and Mrs. Coffey the other, and that I am to keep the rent of the third. I have never had any agreement between my daughters about dividing the property up. It has been kept just the same as it was."

Mrs. Margaret Coffey, one of the heirs, testified: "The arrangement between us was that Mr. Welsh was to stay at the home place his lifetime, and the three houses was to be divided equally,—the rents,—his lifetime. I had never received any rents from my mother's property up to that time. I had no objection to his living in the homestead, or renting it, if he preferred, nor have I now. I was to have the rent of one house on Washington street." On cross-examination she testified further: "What I mean by our conversations between me and my father was, that I was to have the rent of one house on Washington street, Mrs. Dooley the rent of the other one there, and he to have the rent of the one back of the two and also the rent of the home place, or the use of it. That was the arrangement between us. He was to have the benefit of the home place and one house, and I the benefit of one house and my sister the other,—that is, the rents of it. That is all the arrangement there was about it. I never talked with my sister about it or she with me. All the talk I ever had was with my father."

This was the only evidence on the question of the parol assignment of the dower and homestead. We do not think the evidence on this point was sufficient to establish a parol assignment of dower and homestead. From all of the evidence it appeared that the only definite understanding or agreement between the parties was with reference to a division of the rents of the different pieces of property. There was no such meeting of the minds of the parties as to the alleged parol assignment of the dower and homestead as is necessary to constitute a contract. Mr. Welsh testified: "I have never had any agreement between me and my daughters about dividing the property up. It has been kept just as it was." This shows that Mr. Welsh did not understand that the property had been set apart as his homestead; and the testimony of Mrs. Coffey that her father was to have "the rent of the home place, or the use of it," and one of the places on Washington street, and that she and her sister were to have the rents from the other two houses, shows nothing more than a mutual understanding between the parties for a division of the rents of the property. In addition to this, it appears without dispute that Mr. Welsh paid the taxes on all of the property and kept up the repairs at his own expense. He collected the rents and paid them to the daughters or deposited the money in bank for them. Moreover, the testimony makes it clearly appear that whatever arrangement was made, so far as Mrs. Coffey is concerned, was made between herself and her father in the absence of her sister, the only other heir. This being true, the lease executed before a legal assignment of the homestead and dower of Mr. Welsh conveyed no estate to the appellee Dooley, who was a stranger to the title, for it is the rule in this State that a surviving husband or wife cannot sell or convey dower or homestead rights to a person other than the owner of the fee, or lease the same, before dower and homestead has been set off and assigned. (*Best* v. *Jenks,* 123 Ill. 447; *Union Brewing Co.* v. *Meier,* 163 id. 424.)

The appellee Dooley therefore had no interest in the property sought to be condemned, and the judgment in his favor for property taken and for damages to the leasehold must be reversed.

As to the judgments favorable to the appellees Cora and Emma Kelly for the lands actually taken for the right of way of the railroad no complaint is made, but it is insisted that the damages allowed by the jury for the lands not taken are excessive. It is first urged, however, that the court erred in ruling on the admission and exclusion of evidence.

One Grady, a witness called on behalf of the appellees, testified that the tracts of land belonging to the appellees Kelly were worth $150 per acre before the construction of the railroad, and that afterwards the Cora Kelly tract would be worth $110 per acre and the Emma Kelly tract $105 per acre. Upon cross-examination he testified that the land would be worth less with the railroad through it than before, and the court sustained objection to the following question: "How much less do you say?" This question but asked the witness to repeat what he had already testified to, and the refusal of the court could not have materially prejudiced the appellant.

Again, this same witness was asked if the two tracts of land were divided by the proposed railroad would they not sell to the respective adjoining owners as separate fields for more than $90 or $110 per acre. Evidence of this character was properly refused by the court. It was immaterial what adjoining land owners might be willing to pay for the fields. The fair cash market value was the true test. Furthermore, the test should apply to the whole farm,—not as to the fields lying on either side of the right of way.

Frank Brown testified on behalf of the Kellys that there was a good well on the Kelly land which the railroad cut off from another part of the land. On cross-examination he testified the well was about ten or twelve feet deep,—a shallow well down in a low place; that the water stood pretty

well up to the top; that a good well-digger could dig it in half a day, but whether he would get water or not would be the question. He was then asked whether or not there were other low places on the land there. This was objected to for the reason it was not cross-examination. The court sustained the objection and the appellant excepted. We concur in the view of the trial court that this was not proper cross-examination, and we also fail to see what material bearing it could have had, if admitted, on the question of damages.

One Edwin Webb, a witness for the appellees, who had testified the land of Cora Kelly not taken would be depreciated 16⅔ per cent in value by the construction of the railroad, when asked, on cross-examination, to itemize the elements causing the depreciation, mentioned, among other things, that the railroad would make "point rows" on both sides thereof and render the farm more inconvenient to farm on account of the shape it would be left in, and would require more care to make a crop. He was then asked if he thought it would cost 16⅔ per cent more to make the crop than if the fields were square, and whether he knew of any farm that was depreciated in value on account of the shape of the farm after a railroad ran through it, and also whether he knew of any farm through which a railroad ran diagonally that would sell for less money per acre on that account. The court sustained objections to each of these questions. We think the court erroneously restricted the examination by this refusal.

The appellant company offered evidence to show that one witness testifying in its behalf was financially able to buy the lands of both the appellees Kelly, and what he would be willing to pay for the same after the construction of the railroad, and substantially the same evidence was offered as to the Cora Kelly tract separately. The court refused to admit the evidence on the ground it did not constitute the basis of a fair cash market value. This ruling of the court was

correct. It is not what some particular person, even though willing to buy the land, will give for the same that is the basis of the damages to the lands not taken, but what, in the opinion of the witness, can be obtained for it in the market generally. The persons who were alleged to be willing to buy the land at prices equal to that fixed upon before the building of the road were competent to give in testimony their opinions as to the value before and after the building of the road, as other witnesses. What a witness has offered or is willing to pay for the land at the time of the hearing is in nowise binding upon him.

The reason given for the exclusion of the above evidence applies with the same force to the complaint of the appellant company that the court erred in refusing to permit it to ask a real estate agent called in its behalf, to state to the jury whether he had customers who were able and willing to buy the lands of the appellees the Kellys with the railroad constructed on them as proposed, and if so, to state to the jury how many customers and what each was willing to pay.

Complaint is made that the court erred in giving instruction No. 2 asked by the appellees. It is as follows:

"You are instructed that in estimating the damages to the land not taken, if any have been proven, as to defendants Kellys, the jury has the right, and it is its duty, to take into consideration all the evidence offered and admitted, if any, on the question of the damages caused by the right of way remaining unfenced for six months after the railroad is opened for use; the amount on each side the right of way that cannot be cultivated, if any; the probable injury to the adjoining land by the growth of weeds on the right of way, if any; the cutting off or separation of part of the land from water supply, if any; the inconvenience of cultivating the land in two tracts instead of one, if any; the inconvenience and danger of teams being frightened, in cultivating the land, by passing steam engines and cars, if any; the inconvenience of keeping gates closed at farm crossings, if any; the danger

of fire from the operation of train by steam power, if any; the shape of the tract of land with reference to ease and difficulty in cultivation and of egress and ingress, if any."

It is insisted that the probable injury to adjoining land by the growth of weeds on the right of way, the inconvenience and danger of teams being frightened by passing engines and cars and the danger of fire from the operation of trains by steam cars are not proper elements of damage to be considered in estimating the damages to lands not taken, and that therefore the giving of this instruction was prejudicial and reversible error.

The measure of the damages to the land of the appellees not taken for the use of the railroad, if it is depreciated in value by the construction and operation of the railroad, is the difference in the fair cash market value of the land before and after the construction of the railroad, and this the instruction ignores. (*Chicago, Burlington and Northern Railroad Co.* v. *Bowman,* 122 Ill. 595; *Illinois Central Railroad Co.* v. *Turner,* 194 id. 575; *Chicago and Milwaukee Electric Railroad Co.* v. *Mawman,* 206 id. 182.) The instruction was calculated to mislead the jury to believe that the elements of damages therein mentioned were to be considered as independent of and additional to the depreciation in the value of the lands after the construction of the railroad.

In the case at bar it is insisted by all of the parties that the evidence on the question of the amount of damages to the lands of the appellees the Kellys not taken is very conflicting, varying in amount from $10 to $90 per acre. In this state of the record it is necessary that the jury should have been accurately instructed as to the measure of damages. As we have seen, this has not been done, and we can not say that the effect of the erroneous instruction to the jury did not prejudice the cause of the appellant.

For the reasons indicated the judgments must be and they are each reversed, and the cause will be remanded generally as to all the parties.          *Reversed and remanded.*