HORATIO N. CROSBY et al. Plaintiffs in Error, vs. GEORGE
A. DORWARD et al. Defendants in Error.

*Opinion filed February 25, 1911.*

1. DEEDS—*partial impairment of mind is not necessarily ground
for setting aside deed.* The facts that the grantor was old, and
that he was eccentric and acted in an odd manner at times, are
not ground for setting aside his deed if he had sufficient mental
capacity to comprehend the transaction and protect his interests.

2. SAME—*delusions and lapses of memory, unconnected with
transaction, not ground for setting aside a deed.* Delusions and
lapses of memory as to matters unconnected with the transaction
giving rise to a deed are not ground for setting the deed aside.

3. SAME—*sale of property to one occupying fiduciary relation is
not necessarily void.* A sale of property by the owner to his agent
and attorney in fact is not necessarily void, and it will be sustained
if the transaction is shown to be open, honest and fair.

4. SAME—*when sale of land to agent will not be set aside.* A
sale of land by the owner to his agent will not be set aside because
of the fact of the fiduciary relation, where the evidence clearly
shows that the owner was familiar with the land and its value, that
he put his own price thereon for general acceptance by any one,
and that the agent acted openly and without any concealment, pay-
ing the price asked, which was a fair and reasonable one.

5. EVIDENCE—*what tends to weaken testimony of mental incom-
petency.* Testimony that the grantor in a deed was not, in the
opinion of the witnesses, capable of transacting ordinary business,
is weakened by the fact that the witnesses themselves transacted
business with him and admitted that he seemed to understand what
he was about.

6. SAME—*evidence of sales of similar property is important on
question of adequacy of price.* Upon the question whether the
price paid for land was fair and reasonable, evidence of voluntary
*bona fide* sales of similar land in the vicinity of that sold, and oc-
curring about the time of the sale of the land in question, is com-
petent and is an important factor in determining such question.

7. SAME—*mere offers for land are not competent upon question
of value.* In order to show the value of land it is not competent
to prove mere private offers for the property itself or property in
the vicinity similarly situated.

WRIT OF ERROR to the Circuit Court of Woodford
county; the Hon. GEORGE W. PATTON, Judge, presiding.

JESSE BLACK, JR., and WINSLOW EVANS, for plaintiffs in error.

THOMAS KENNEDY, and W. H. FOSTER, for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a bill brought in the circuit court of Woodford county by plaintiffs in error, Horatio N. Crosby and his conservator, against defendants in error, George A. Dorward and wife, asking that a certain deed to an eighty-acre farm in that county be set aside on the ground that it was obtained by reason of fiduciary relationship from one lacking in mental capacity and for an inadequate consideration. The master in chancery to whom the case was referred reported in favor of granting the relief prayed. The trial court sustained exceptions to this report and dismissed the bill for want of equity. From that order and decree this writ of error has been sued out.

Plaintiff in error Horatio N. Crosby was, at the time the deed in question was given, about sixty-five years of age. He was a bachelor and had been raised in Tazewell and Woodford counties, Illinois. In the year 1866 he was committed to an insane asylum and discharged in a little over six months as recovered. He was again committed in 1869 and remained about eight months, when he was discharged as recovered. He had inherited the farm in question from his father, who died about 1885. The evidence tends to show that he did not carry on this farm himself but usually leased it to others. In 1904 he visited a brother, John E. Crosby, in Wayne county, Iowa. While there he wrote to the defendant in error George A. Dorward, asking him to take charge of his business and collect certain notes and rents that were due and owing to him. About the same time he signed a power of attorney, dated

August 22, 1904, authorizing Dorward ·to take charge of his personal property, which was then in the hands of Crosby's sister, Mary Humphrey.· This power of attorney was made out in Iowa and sent to Dorward with a letter from Crosby's Iowa attorneys. Dorward, under this power of attorney, leased the farm in question to Uriah H. Humphrey, a nephew of Crosby, for one year at a rental of $4.50 per acre, a written lease being signed by Humphrey and Dorward. This was fifty cents per acre more than Humphrey had been paying for several years for the farm under an agreement with Crosby. A number of letters from Crosby to Dorward are found in the record. Some of these letters, without question, were written by some other person for Crosby and signed by him, although a large number were written as well as signed by him. The letters which he himself wrote, while lacking as to spelling, grammar and punctuation, are easily understood, and instruct Dorward, in positive terms, as to what he (Crosby) wanted done in regard to the various business matters, and while in these letters there were matters foreign to the business in hand interjected, these outside matters did not in any way render obscure his letters on the business in question. These letters do not indicate that the writer did not know his own mind or was incapable of transacting ordinary business.

The first evidence in the record as to the sale of the farm by Crosby to Dorward is a letter written at Corydon, Iowa, March 1, 1905, stating that Crosby would sell the farm for $135 an acre, one-half down and the balance to suit the buyer, at six per cent, possession given at once if Uriah Humphrey could be gotten off. On March 21, 1905, Crosby and Dorward entered into an agreement for the sale of this farm to the latter for $135 an acre, or $10,800, to be paid, $3141.66 on the execution of the contract, $2400 on March 1, 1906, and the balance ($5258.34) on March 1, 1907. This latter amount drew interest at six per cent after March 1, 1906. This business, as shown by the rec-

ord, was all conducted by correspondence. Dorward paid the consideration as agreed, partly by drafts and partly by note. The deed was dated March 21, 1905, and was signed and acknowledged in Iowa. The notary public who took the acknowledgment was an attorney with years of experience, having held several important public positions, including that of United States district attorney. He testified that in his judgment Crosby was of sound mind and memory and understood the nature of the business; that Crosby and his brother, John, came to his office with the deed and Crosby acknowledged it. A little over a year after the making of this sale, April 19, 1906, Crosby was adjudged a distracted person and T. W. Gish was appointed as his conservator. Upon Gish's removal from the State, the plaintiff in error Mary Humphrey was appointed conservator in his stead, April 4, 1907. This suit was instituted August 24, 1906, by Gish.

A number of witnesses testified, in general terms, as to Crosby's lack of mental capacity but did not state the particular facts upon which they based their opinions. The chief circumstances found in the record testified to as tending to indicate unsoundness of mind are the following: One witness stated that Crosby wished to make him a present of a vacant lot in Eureka, Illinois, which the witness refused to accept. This witness was an old army friend of Crosby and the latter had been in the habit of stopping at his house. The witness was a laboring man and not well off. He also stated that Crosby had placed two claims in his hands as a constable, and that when he (the witness) thought the persons were about ready to pay, Crosby forgave them the debts. These debtors appear to have been judgment-proof. Two witnesses gave as particular instances upon which they based their opinions of his mental unsoundness, that Crosby would walk along the road talking to himself and pay no attention to passers-by. A niece testified that some time before this trade she had gone to

Iowa with him for a visit; that he purchased through tickets before they started, and that when they changed cars at Bushnell, Crosby bought another set of tickets; that she afterwards, through the conductor, had the money refunded. A brother-in-law testified that Crosby had gone visiting and lost his overcoat, false teeth and pocket-book. Certain other witnesses testified that Crosby, although an illiterate man, tried to write poetry, which he attempted to have printed, and that he stated he was proud of the fact that he could play a Jew's harp and sing at the same time, and that he purchased a number of these instruments. Another witness testified that when he was driving in a cutter one winter he came to where Crosby was standing and asked him to get in and ride, and that, although he had met Crosby frequently, the latter did not recognize him or remember any of the subjects which they had discussed together. Another said that Crosby had broken out in church whistling a part of some air, which made the congregation look towards him and laugh. Three doctors also testified as experts, to the effect that Crosby was lacking in mental capacity, and, though possibly not insane, was peculiar and simple. About fifteen witnesses in Illinois and three in Iowa testified that they did not think he had sufficient mental capacity to do ordinary business or sell the farm in question.

Some twenty-one witnesses in Illinois testified they thought Crosby capable of transacting business. Among them were a banker, two lawyers, several farmers, two men who, while acting as assessor, had assessed his land, an ex-county clerk, who was then a bank cashier, and also a doctor who had known Crosby thirty-nine years. In addition to this testimony the depositions of some twenty-two witnesses for defendants in error were taken in Iowa and introduced on the hearing. All of these latter testified they considered him of sound mind and capable of conducting the business of selling this farm. Among these latter witnesses were an attorney, pension agent, a storekeeper, a man with whom

he had boarded in Iowa, a man with whom he had talked about buying a monument, a dentist who did some work for him, and the cashier of a bank where he deposited money.

The law is that old age, eccentricity, or even partial impairment of mental faculties, is not necessarily sufficient to set aside a deed. If the grantor had sufficient mental capacity to comprehend the nature of the transaction and protect his own interests the deed will not be set aside for want of mental capacity. (*McLaughlin* v. *McLaughlin,* 241 Ill. 366; *Sears* v. *Vaughan,* 230 id. 572; *Baker* v. *Baker,* 239 id. 82.) And this is true even though he may have been affected with certain delusions or lapses of memory, if they did not affect or have anything to do with the transaction in question. (*Kelly* v. *Nusbaum,* 244 Ill. 158.) The evidence of some of the witnesses who testified that Crosby was not competent to transact ordinary business is weakened by the fact that they transacted business with him and admitted that he seemed to understand what he was about. (*Fitzgerald* v. *Allen,* 240 Ill. 80.) There can be no question that Crosby was eccentric and acted at times in an odd manner, but, so far as shown by this record, all the business that was carried on by him was done in a reasonably business-like manner. We think not only the number of witnesses but the weight of the evidence upholds the finding of the trial court that he understood and comprehended the business he was engaged in at the time he sold his farm.

Conceding that a fiduciary relation existed between George A. Dorward and Crosby at the time of this transaction, it does not necessarily follow that the deed is void or voidable. The sale of property under such circumstances will be sustained where the transaction is open, honest and fair. (*Laclede Bank* v. *Keeler,* 109 Ill. 385.) It does not appear that any misrepresentations were made by Dorward or that he attempted to conceal or mislead Crosby in any way in the purchase of this farm. The record shows that Crosby offered, by letter, to sell the farm, the wording of

the letter indicating that it was a general offer for anyone who wanted to buy, and that the purchase price agreed on was the one fixed by Crosby.

On the question of value plaintiffs in error introduced some fifteen witnesses, who testified that they owned land in the vicinity and that they considered this eighty-acre farm worth $150 to $180 per acre. While several of these witnesses testified that they knew of actual sales ranging between those figures, it does not appear from the abstract that they stated, at all definitely, the location or owners of the farms referred to or the date of the sales, or that they had any means of knowing the circumstances of the transactions, other than mere rumor and hearsay. On this question about the same number of witnesses were introduced by defendants in error, and their estimates ran from $120 to $140, or an average of about $131 an acre. The Crosby farm sold for $135, subject to the lease. Considerable controversy· exists in the briefs as to the character of other farms referred to by various witnesses as compared with the eighty-acre farm in question. The testimony shows that there are two kinds of land in that vicinity,—that which is rolling and more or less wooded, and the flat prairie land,—which vary considerably in value. The evidence tended to show that land had advanced quite steadily for a number of years in Woodford county, and that the price at a given time might not serve as a fair index at another time several years later. Various witnesses for defendants in error testified as to some ten or more different sales of land located within a radius of a few miles from the Crosby farm, at about the time of the sale of that farm to Dorward, many of the witnesses being those who had either bought or sold in those transactions. From their testimony it appears that actual sales were being made in that vicinity at about that time for from $115 to $133.50. There is evidence tending to show that some of the farms so sold were partly wooded and broken and not as valuable, per acre, as

the Crosby farm, but it seems to be admitted other farms mentioned were as valuable and as favorably or more favorably situated with reference to markets and with as good or better improvements than the Crosby farm. One of the most important factors in determining the value of property is the sale of similar property in the same neighborhood about the time of the transaction in question. Lewis on Eminent Domain, sec. 443; *Watson* v. *Milwaukee and Madison Railway Co.* 57 Wis. 332.

It is insisted in this connection that the testimony of one Rich that he offered Crosby, in 1904, $165 an acre for this farm and that he thought it was worth that, tends strongly to support the contention of plaintiffs in error that the farm was worth more than $135 per acre. This evidence, we think, was incompetent. In order to show the value of property it is not competent to prove offers for the property itself or other property similarly situated in the vicinity. Private offers could be multiplied to any extent, and the bad faith in which they were made, if so made, would be difficult to prove. *Chicago, Bloomington and Decatur Railway Co.* v. *Kelly,* 221 Ill. 498; *Hine* v. *M. Ry. Co.* 132 N. Y. 477; *Davis* v. *Charles River Branch Railroad Co.* 65 Mass. 506; *Watson* v. *Milwaukee and Madison Railway Co. supra;* Lewis on Eminent Domain, sec. 446.

We think the evidence satisfactorily shows defendant in error Dorward paid what the land was reasonably worth at the time the purchase was made. In our judgment a clear preponderance of the evidence sustains the findings of the chancellor.

The decree of the circuit court will be affirmed.

*Decree affirmed.*