(No. 14518.—Reversed and remanded.)
HENRIETTA E. DOUGHERTY, Appellee, *vs.* NEIL S. DUCKELS *et al.* Appellants.

*Opinion filed June 21, 1922.*

1. CONTRACTS—*relinquishment of right to contest will is a sufficient consideration for an agreement.* Where a son is dissatisfied with the provisions of his mother's will, a relinquishment of his right to contest the will is a sufficient consideration for an agreement with his sister, who was the principal devisee, that the will be set aside and that the property be disposed of as provided in the agreement, where the son in good faith was proposing to file a bill to contest the will, had employed counsel and looked up evidence for the purpose.

2. SAME—*compromise of disputed claim is a sufficient consideration to support an agreement.* A compromise of a disputed claim made in good faith, whereby the claim is extinguished, is a sufficient consideration to support an agreement, and the courts will not inquire into the merits of the claim to determine whether it could have been successfully maintained in a suit brought to enforce it.

3. DEEDS—*mere relationship of brother and sister does not establish fiduciary relation.* The mere relationship of brother and sister does not necessarily establish a fiduciary relation even though the sister gives the brother a power of attorney authorizing him to do all things necessary to settle their mother's estate, where the evidence shows that she did not rely on him to advise and protect her but handled her own interests.

4. SAME—*what is necessary to establish a fiduciary relation.* To establish a fiduciary relation the evidence must disclose a state of facts showing confidence reposed on one side and resulting superiority and influence on the other, so that the one in whom the confidence is reposed is in equity and good conscience bound to act in good faith with regard to the interests of the one reposing the confidence.

5. SAME—*effect of existence of fiduciary relation between parties to deed.* While a deed between parties where a fiduciary relation exists is not necessarily void, a court of equity will not permit the dominant party to use his position to secure an undue advantage over the other and will require him to prove that the transaction was fair, and wherever influence has been acquired and abused, confidence reposed and betrayed, relief will be granted the wronged party.

APPEAL from the Circuit Court of Macoupin county; the Hon. F. W. BURTON, Judge, presiding.

L. O. VAUGHT, (BELLATTI, BELLATTI & MORIARTY, of counsel,) for appellants.

WORTHINGTON, REEVE & GREEN, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This appeal is prosecuted from a decree of the circuit court of Macoupin county granting the prayer of an amended bill filed by the appellee to set aside certain deeds made by her to appellant and for other relief. Neil S. Duckels (hereafter called appellant) and appellee are the only surviving children and heirs of Henrietta Duckels, who died testate April 9, 1915, leaving no surviving husband. Mrs. Duckels was a resident of Morgan county, Illinois, but for the last few years of her life she had been living most of her time in States where the climate was more agreeable to her than Illinois. She died in San Antonio, Texas. Appellant, her son, had for many years been residing in California, and her daughter, the appellee, being unmarried, lived with her mother. At the time of her death Mrs. Duckels owned 145 acres of farm land in Macoupin county, a residence property in Jacksonville, 349 acres of land in Jackson county, Texas, and some personal property which does not appear to have been of great value. By her will she charged appellant with an advancement of $21,400 and gave him one-half of the Texas land and a bequest of $2000. She gave appellee all her personal property, all the land in Illinois and one-half of the Texas land. The will was executed in 1909. Mrs. Duckels' body was brought to Illinois for burial and both the appellant and appellee were at the funeral. When the will was read, shortly after the funeral, appellant expressed dissatisfaction with it, refused to enter his appearance to the application for its probate and an-

nounced his intention to contest it. Before he left Jacksonville to return to his home in California he consulted and employed counsel and made investigations in St. Louis, where his mother had been treated by a specialist, and in San Antonio, and in Jackson county, Texas, for evidence to use in the contest. The will gave the coal underlying the Macoupin county land to George Ball, one of the persons named as executors, in trust for fifteen years, to sell the same and divide the proceeds equally between appellant and appellee. The will was admitted to probate May 24, 1915, and Ball qualified as sole executor. While appellant was in San Antonio he called upon appellee, who had returned there after the funeral. It appears that their relations had not been of a very friendly character for several years. The advancement charged to appellant in the will was made some years before the will was executed, by the payment of liabilities of appellant resulting from an unfortunate business venture, and which caused unfriendly feelings between appellee and appellant. Appellant claimed he had reason to believe appellee received from her mother considerable sums of money which had not been charged to her as advancements. Appellee heard by letter received from Ball before the brother's visit to her in San Antonio soon after the funeral, that appellant was going to contest the will. She asked him what he was going to do about it, and he said he was going to contest the will and that his attorney had advised him he had sufficient evidence. Appellee said she did not want a contest and would rather compromise than have a lawsuit, and appellant testified she asked him what he would do if she would agree that the will be set aside. They then agreed upon a settlement of the controversy, which they put in the form of a written agreement prepared by themselves. The agreement provided that the will be set aside and the estate be disposed of the same as if there had been no will; that appellant would pay appellee $8000 in addition to an equal division

of the estate, to be deducted from his share at the time of final settlement of the estate. The agreement recited that the real estate should not be sold until business conditions improved, when it would be disposed of in the manner that then seemed best. The agreement was dated May 13, 1915, was signed in triplicate, each of the parties keeping a copy and appellee mailed one to Ball, the executor, with a letter in which she expressed her satisfaction with the settlement. Appellant also wrote Ball that he had heard Ball and his attorneys were not intending to recognize the settlement agreement and inquired if that was true. Ball answered that he did not intend to interfere with the settlement "provided it is fair." He later wrote appellant that he was advised not to consent to setting the will aside. In April, 1916, just before the expiration of one year from the admission of the will to probate, appellant and appellee joined in a bill filed in Morgan county to set aside the will, which suit was never tried and was finally dismissed. Appellant testified the bill was filed because of Ball's attitude toward the settlement and as a matter of precaution to avoid the bar of a contest. January 10, 1916, appellee executed quitclaim deeds to appellant for the undivided one-half of all the real estate in Illinois. Afterward she wrote appellant proposing to sell to him all her interest in the land in Illinois and Texas for $21,000. Appellant refused to consider it and testified he advised her not to sell. She continued to write him about buying it and finally offered to take $18,000. Early in July, 1916, appellant stopped at San Antonio on his way to Illinois and agreed to buy appellee's interest for $18,000 provided he could arrange in Illinois to borrow the money. While appellant was then in San Antonio he and appellee united in executing a mortgage on the Illinois farm land to E. E. Crabtree to procure a loan of $3500 to pay debts of their mother's estate. Appellee also at that time gave the appellant a power of attorney authorizing him to do all things necessary to close up their

mother's estate. July 12, 1916, appellant mortgaged the undivided one-half of the Illinois farm land to secure an indebtedness of $4825 of his to a bank. After much correspondence an agreement was entered into between the parties August 9, 1916, which recites it is in substitution of all former agreements and a complete settlement between the parties. By it appellee agreed to convey to appellant all her right, title and interest in the Texas and Illinois land except the coal under the Illinois farm land, and also assigned to him whatever interest she had in the personal estate of their mother which had not been disposed of. Appellant agreed to pay her $1000 cash and give her a non-negotiable note for $15,000, bearing five per cent interest after October 1, 1916, payable in monthly installments, beginning October 1, 1917, the principal payable in installments of $800, the first installment payable October 1, 1921, and a like installment on the first of October each year thereafter until the note was fully paid, the note to be secured by first mortgage on the half interest in the Illinois farm land conveyed by appellee to appellant. Appellee executed deeds in accordance with the agreement and appellant paid the $1000 cash, and he and his wife executed both the note and mortgage to secure the $15,000. July 15, 1918, appellee filed a bill in Texas to set aside the deed to appellant for her interest in the Texas land on the ground that she was of unsound mind and the conveyance was obtained by fraud. The original bill in this case was filed in Macoupin county on November 17, 1919, for foreclosure of the mortgage for default of the appellant in making payments as they became due. Appellant answered the bill and filed a cross-bill, setting up, in substance, that the suit in Texas was the cause of his default; that he defended that suit at great expense and had appealed from a decree of the district court setting aside appellee's deed to him. April 12, 1920, appellee filed her amended bill to set aside her deeds to the Illinois land, on the ground that

she was mentally and physically weak and they were procured by appellant by fraud and intimidation.  Both the amended bill and the answer to it are lengthy, going into much detail, but the gist of the charge is that appellee was not of sound mind and appellant procured the deeds by fraud, all of which is denied.  The cause was referred to the master in chancery.  A little oral evidence was heard, but practically all the evidence of both parties was a transcript of the record of the trial of the case in the district court of Texas.  The master reported that the evidence sustained the allegations of appellee's bill as to her unsoundness of mind and the fraud of appellant in procuring the deeds.  He recommended a decree as prayed in the bill. The chancellor overruled exceptions of appellant to the master's report except the finding that appellee was *non compos,* and found and decreed that she was of weak mentality, acted under the influence of appellant, and was not capable, under the circumstances, of protecting her interests.  The decree set aside the deeds, ordered appellant to pay the Crabtree mortgage, that appellant and his wife, within thirty days, execute deeds to appellee for the Illinois land except the coal underlying the farm land, and that appellee surrender the $15,000 note.

There was a complete failure of proof that appellee was so mentally unsound as to be incapable of understanding the nature and effect of her acts in executing the agreements and deeds.  The decree finds appellee was not *non compos* but that she was of weak mentality, had no financial judgment and was acting under the influence of appellant when she made the agreement and deeds; that appellant obtained the title through fraud, without adequate consideration, and through his fiduciary relation to appellee.  We fail to find the proof to sustain the finding that appellee was of weak mentality.  She was over thirty years old when the transactions between her and appellant took place and for several years before her mother's death had

transacted her business. She collected rents, interest, made loans, borrowed money and looked after the bank account, which she kept in her own name. During the last year of Mrs. Duckels' life appellee negotiated loans for her with John Leach, of Jacksonville, Illinois, aggregating $2700. The record contains many letters written to appellant, to Ball, the executor, and others, and they are all intelligent and show she had a clear conception of the affairs of the estate and the affairs about which she wrote. The only weakness indicated by the proof is that she managed to get rid of more money than could reasonably be accounted for. Appellant wrote Ball of this after his first visit to appellee, in May, 1915; that appellee was unable to explain how she had expended all the money she had received; that she said she had less than $100 in the bank; that she asked appellant to write to Ball to loan her $1000 of the estate money. Appellant said he could not understand how she got rid of her money so fast unless she was the victim of leeches. He suggested that Ball pay her $50 or $60 per month until more was available. In a letter to Ball on May 13, 1915, appellant wrote appellee had in the year 1914, and up to April, 1915, come into possession of $5000, which she claims to have expended in living expenses. Appellant referred to the known living expenses and said it was a small fraction of the sum received; that appellee was worried as to how she would live until the estate was settled, and he expressed the belief that "some people were preying on her" and that a conservator should be appointed for her. Appellant testified that there was no question that appellee's mental condition was sound, but his suggestion of the appointment of a conservator was on the ground that she was a spendthrift, but he finally decided that could be avoided and none was ever appointed. March 27, 1916, appellee wrote appellant asking him to buy the residence property in Jacksonville. Appellant wrote her he did not want to buy it. He testified she then wrote him asking him to buy

her interest in all the land. She wrote him repeatedly about selling to him. Appellant did not want to buy it. He had no money and advised appellee not to sell. The first price she asked was $21,000. Finally she offered to sell to him for $18,000, and the agreement for the sale was made August 9, 1916, on the terms before stated. The proof shows appellee urged appellant to buy her out; that he did not want to do so; that he had no money to pay for it, and he did not at any time encourage her to sell. In August, 1917, appellee executed another deed to appellant to the Texas land for the purpose of correcting a misdescription in her former deed to him for the same land. Several letters written by appellee to appellant after she made him the deeds clearly show she understood the transactions. Before the first installment of interest came due on the $15,000 mortgage note, she wrote appellant reminding him it was nearly due and requested him to send her a draft for it. In 1918 she wrote appellant four letters and sent him three telegrams demanding payment of interest on the note. November 29, 1918, her attorney in Texas wrote to appellant's attorneys that appellant was in default on the $15,000 note; that appellee had authority to declare the whole amount due, with ten per cent attorney's fees, and was insisting that action be taken. Appellant had paid all interest due up to the time appellee began her suit in Texas, and he testified that the beginning of that suit was the first he knew of her dissatisfaction with the transaction between them. That suit was begun July 15, 1918, and after that appellee wrote appellant twice demanding payment of the interest and her attorneys wrote appellant's attorneys threatening foreclosure. The case in Texas was tried in the district court in October, 1919, by the same attorneys representing the parties in this case, and a decree was entered before the amended bill in this case was filed. The original bill in this case was filed November 17, 1919, more than a year after the Texas suit was begun, and prayed for the foreclosure of

the mortgage. In the Texas suit appellee asked that her deed to appellant for the land in that State be set aside for fraud and her unsoundness of mind, and in this State she was seeking by the original bill to obtain the benefit of her sale of the Illinois land made at the same time she made the deed for the Texas land. Appellee seeks to explain this action on the ground that she received information appellant had sold the Illinois farm land. She received a newspaper clipping in a letter from Ball, the executor, requesting her to show it to her Texas attorney. The clipping had a date line Virden, Illinois, October 22. It stated deeds had been recorded of a sale by the Midvalley Coal Company to James F. Miller of 120 acres of land immediately west of Virden, known as the Henrietta Duckels farm. Appellee's Texas attorney testified she showed him the clipping and Ball's letter about October 27, 1919, and he wrote Ball the same day to procure and send him a copy of the deed whereby appellant conveyed the land. October 28 he wrote appellee's Illinois attorneys about the statement in the newspaper clipping. The letter stated appellee had been hesitating whether to file a bill to set aside the deed or to foreclose the mortgage, but if appellant had sold the land she had no other remedy except foreclosure. Appellee testified she learned within a week after she received the clipping that appellant had not sold the Illinois farm land and she then left everything to her attorneys. She knew at least two weeks before the original bill was filed that appellant had not sold the land, and the inference is warranted that her attorneys were so informed, and not until after she had secured a decree in the district court of Texas setting aside her deed to the Texas land did she file her amended bill.

We cannot take the time and space to set out the evidence more fully, but we are convinced that there is an entire failure to prove the allegations of the bill as to appellee's condition of mind or that she did not voluntarily and un-

derstandingly execute the agreements and deeds. She acquiesced in the transaction for about two years before she began her suit in Texas and five years before she filed her amended bill in Illinois. Her many letters clearly show during all that time that she knew and comprehended the entire transaction. By her demand for and acceptance of the performance of the agreement before she brought her Texas suit, and her demands for performance even after bringing that suit, she ratified the agreements and transactions. Her bill to foreclose the mortgage, filed November 17, 1919, we cannot regard otherwise than a ratification with full knowledge of all the facts. It was filed a month after her attorney testified the suit in Texas had been tried. The excuse that she then believed appellant had sold the land is untenable. The bill did not make the reputed purchaser a party defendant, and she knew before filing it that the land had not been sold. No new information came to her concerning the alleged fraud of appellant after she filed her bill in Texas. That case was tried, as we have said, in October, 1919, on practically the same pleadings and evidence as in this case. Pursuant to the agreement of May 13, 1915, and about eight months after its date, appellee made deeds conveying to appellant the undivided half of all the land in Illinois, and seven months later made the contract for the sale of her interest in all the land to appellant except the coal underlying the Illinois farm land, and executed the deeds. As we have said, appellee's letters,—and there are many of them in the record,—show she understood all that she had done. Her Texas attorney in a letter to appellant September 14, 1918, about the Texas suit, which was begun the previous July, said: "From what I have seen of your sister, it appears she is quite capable of handling her business affairs," and the evidence in this record supports that statement.

It is contended by appellee that there was no consideration for the agreement of May, 1915, pursuant to which

she conveyed to the appellant a half interest in the Illinois land, and that the consideration for the sale to appellant pursuant to the agreement of August, 1916, was so grossly inadequate as to be conclusive evidence of fraud and warrants a decree setting aside the deeds. The consideration for the agreement between the parties of May, 1915, that the will be set aside and both share the estate the same as if no will had been made, except that appellant would allow appellee $8000 more than he received, was the relinquishment by appellant of his right to contest the will. So far as this record shows, appellant was in good faith proposing to file a bill to contest the will. He had employed counsel and looked up evidence for that purpose. Ball, the executor of the will, wrote appellee May 6, 1915, it was rumored from a seemingly reliable source that appellant was going to contest the will, and if he did, there would be a long and costly legal battle. She had that information before she saw her brother on May 13, when the compromise agreement was made. Appellant at that time told appellee he was going to contest the will. He testified that when he called on her in May, 1915, he had no thought of a compromise; that she asked him what he would do if she agreed to set aside the will, and after much talk between them the agreement was made. A compromise of a disputed claim made in good faith, whereby the claim is extinguished, is a sufficient consideration to support an agreement. Courts will not inquire into the merits of the claim to determine whether it could have been successfully maintained in a suit brought to enforce it. If the claim is entertained in good faith and the parties disagree as to its reasonableness or legality, its compromise affords sufficient consideration to support a promise or agreement. (*Walker* v. *Shepard,* 210 Ill. 100; 6 R. C. L. sec. 72, p. 663; 13 Corpus Juris, 342.) The sale of appellee's remaining half of the land was made pursuant to a written contract executed August 9, 1916, which recited it was "in consummation of

and substitution for all former negotiations and agreements relating to the same subject matter" made by the same parties.

Appellee contends that the consideration paid her for the land was grossly inadequate and the deeds should be set aside on that ground. In determining that question we are confined to the value at the time of the sale, as shown by the proof. The value of the farm land in Illinois was shown to be $25,000, the residence property $3000, and the Texas land was worth, at the time of the sale, about $6200 or $6300. The consideration paid included the assumption of the debts of the estate, amounting to more than $3000, and fully equaled the value of the land, the coal being reserved.

The evidence does not sustain appellee's contention of the existence of a fiduciary relation of appellant to her; that she trusted in and relied upon him, and that he abused her trust and confidence and imposed on her to her detriment. The mere fact of the relationship between them of brother and sister does not necessarily establish the evidence of a fiduciary relation. The term involves the idea of trust and confidence. To establish a fiduciary relation the evidence must disclose a state of facts showing confidence reposed on one side and resulting superiority and influence on the other. While a deed between parties wherein a fiduciary relation exists is not necessarily void, a court of equity will not permit the dominant party to use his position to secure an undue advantage of the other and will require him to prove the transaction was fair. Wherever influence has been acquired and abused, confidence reposed and betrayed, relief will be granted the wronged party. The relation is said to exist where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith with regard to the interests of the one reposing the confidence. (*Crosby* v. *Dorward*, 248 Ill. 471; *Mayrand* v. *Mayrand*, 194 id. 45; *Bordner* v.

*Kelso,* 293 id. 175; *Campbell* v. *Freeman,* 296 id. 536; 25 Corpus Juris, 1118.) The power of attorney appellee gave appellant July 3, 1916, authorizing him to do all things necessary to wind up and settle their mother's estate, we think of little weight on the question of a fiduciary relation in view of all the evidence. Appellant had for many years resided in California while appellee lived with her mother in Illinois and Texas. The relations between appellee and appellant had not been very friendly and cordial on account of the payment by their mother of appellant's debts before she made her will, and appellee's letters to appellant and others after her mother's death fail to show she reposed confidence in or relied on him to advise and protect her. On the contrary, her letters indicate she placed no such trust in him but was protecting her own interests. The sale of her land to appellant in 1916 was suggested by her and urged until he finally bought it.

We are firmly of the opinion the proof did not warrant the decree. We have before stated that appellant in this case prosecuted an appeal from the district court of Texas to the court of civil appeals. That court delivered an opinion June 17, 1920, reversing the decree of the district court and rendering judgment for appellant. The opinion sets out the pleadings and evidence at great length and covers twenty-three pages of the record. The pleadings and evidence were substantially the same there as here. The opinion sets out the findings of the decree of the district court upon which it decreed that the deeds to the Texas land be set aside, and the court held there was no material evidence to support the findings and decree of the district court. The court said in part: "We have carefully examined and considered all the evidence and circumstances proven favorable to plaintiff, disregarding all evidence adverse thereto, and after such examination and consideration have reached the conclusion that from these facts and circumstances all

reasonable men can draw but one conclusion, and that is that they do not support the material findings of the court hereinbefore set out nor the judgment rendered, but, to the contrary, they do conclusively show that at the time Nellie executed the contract of August 9, 1916, and all the deeds under its terms, she was fully capable of understanding, and that she did understand and appreciate, what she was doing, and that of her own free will she intended to, and did, convey to Neil the three tracts of land described in said deeds for the consideration therein expressed; that they do conclusively show that the lands conveyed by said deeds were not worth more than the price paid therefor by Neil and that Neil derived no enormous profit out of his transactions with Nellie, and that they do unquestionably and conclusively show that long after Nellie fully understood and appreciated all the details of her transaction with Neil she collected interest due on the $15,000 note given in part payment for the land conveyed by her, and even after her marriage and after she filed this suit she sought benefits under the contract which she now by this suit seeks to rescind, and that by accepting such benefits she ratified the contract and cannot now repudiate the same and avoid its provisions." A motion for rehearing was filed, and on the motion the court said it adhered to the conclusion stated in its opinion, but had concluded, as the facts may not have been fully developed, the judgment should be set aside and a judgment entered reversing the decree and remanding the case for another trial. We are unable to take any other view of the evidence than that taken by the Texas court of civil appeals.

The decree is reversed and the cause remanded.

*Reversed and remanded.*