J. T. ESSARY, Admr., Plaintiff in Error, *vs.* NELLIE MAR-
VEL *et al.* Defendants in Error.

*Opinion filed October 24, 1916.*

1. EVIDENCE—*section 2 of Evidence act does not apply to one who defends as grantee of his deceased father.* One who defends as grantee in a deed made to him by his deceased father and not as heir or devisee cannot have the testimony of interested witnesses as to the incompetency of the deceased to make the deed excluded under section 2 of the Evidence act, where the witnesses were called by the administrator of the deceased in a suit to cancel the deed and sell the land to pay debts of the estate.

2. DEEDS—*a grantor subject to delusions may make valid deed.* A grantor may be subject to delusions, yet if they exert no influence upon him in making a deed the deed is not invalid because of such delusions.

3. SAME—*weakness of mental faculties may not prevent making valid deed.* The mental faculties of a person may be impaired by disease or old age and yet he may have sufficient mental capacity to make a will or a deed.

4. SAME—*when deed will not be set aside for want of mental capacity.* If the grantor in a deed has sufficient mental capacity to comprehend the nature of the transaction and the effect of his acts and can exercise his will with reference thereto the deed will not be set aside for want of mental capacity.

5. SAME—*statements of grantor are not admissible to impeach title in a deed.* Where a deed is executed and delivered it takes .effect and places the title beyond the control of the grantor, and his statements in disparagement of the title or in arraignment of the character or actions of the grantee after the deed is executed and delivered are not admissible to impeach it.

WRIT OF ERROR to the County Court of Franklin county; the Hon. THOMAS J. LAYMAN, Judge, presiding.

J. P. MOONEYHAM, and W. P. SEEBER, for plaintiff in error.

MOSES PULVERMAN, and A. E. SOMERS, for defendants in error Joseph F. Watson, Jr., and George H. Mitchell.

·Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error filed a petition in the county court of Franklin county to sell real estate to pay debts and to cancel certain warranty deeds made by Joseph F. Watson, Sr., deceased, on October 23, 1908, to his son Joseph F. Watson, Jr., and to Nellie Marvel, his daughter, and a mortgage deed made after said date by Joseph F. Watson, Sr., to George H. Mitchell, as clouds on the title. Said grantees and Charles Watson, as children and only heirs of said deceased, and said mortgagee, were named as defendants to the petition, which, in addition to the statutory averments required in a petition to sell real estate to pay debts of a deceased, charged that said warranty deeds were made without valuable consideration therefor; that they were procured by fraud, misrepresentations, intimidation and undue influence; that at the making thereof, and for many years prior thereto, said Joseph F. Watson, Sr., was of unsound mind and incapable of transacting the usual and ordinary business affairs of life, and by reason of such unsoundness of mind was incapable of executing a valid deed of conveyance and that said deeds are therefore invalid. All the defendants except Charles Watson filed answers denying the allegations in the petition, Charles Watson making default. On the hearing the court found against the petitioner and denied his prayer for the cancellation of said deeds, but made an order for the sale of the coal under another tract of land not involved in this court and of which the deceased died seized.·

There is no evidence in the record tending to show intimidation or undue influence in any form and there is no proof of fraud, actual or constructive, as the evidence does not show the deceased owed any debt at the time the deeds in question were made that is unpaid or that they were made in contemplation of his becoming indebted. The only ground urged by plaintiff in error for a reversal of the judgment is that Joseph· F. Watson, Sr., had not sufficient

274 — 37

mental capacity to make a valid deed when he executed the deeds in question.

The evidence in the record shows that the deceased owned in his lifetime one hundred and sixty acres of land situated in Saline county, Illinois, and that he had lived most all of his life on the part of it in question. In November, 1907, he conveyed forty acres thereof to his illegitimate daughter, May Samuels, reserving the coal and other mineral rights thereunder, which by the decree in this case were ordered sold. During the last five or more years of his life he and his wife were estranged and lived apart. For about sixteen months prior to 1908 he lived with his daughter, Nellie Marvel, wife of Logan Marvel, while his wife lived with his son Joe, on the old homestead. During 1908 he lived with Joe at the homestead, and while his wife lived there also and he seemed solicitous about her being well cared for, yet they remained estranged up to her death. In January, 1909, he went to Nellie's home in Franklin county and there lived until he died, June 30, 1911, leaving the said three children and several illegitimate children but no widow him surviving. A conservator was appointed in 1910 to have the custody of the person and the care of the property of Watson, and the testimony of A. J. Sanders shows that he was appointed as such conservator some time in the year 1909. At the death of Watson his conservator became his administrator, and Nellie Marvel had probated and allowed a claim against his estate for near $1500 for care and support of her father, and Dr. Marcus D. L. Carter also had a claim allowed against his estate, presumably for services as a physician, and they are the principal witnesses for defendants in error. Their competency as witnesses was objected to under section 2 of the statute on evidence and depositions, and that question is presented here for determination preliminary to the main question. It is true, as suggested by defendant in error Joseph F. Watson, Jr., that they are interested in the result of this

suit, and that Nellie Marvel, although denying the allegations of the petition as to the incompetency of the deceased to make the deeds in question, was nevertheless palpably in sympathy with the plaintiff in error and more interested in his recovering in the suit. They were called as witnesses by the plaintiff in error. Joseph F. Watson, Jr., was not defending the suit as an heir or devisee of his father but as a grantee in the deed made to him by his father, the deceased. Said section of the statute does not therefore give him the privilege to have their testimony excluded on the ground that they are incompetent witnesses when called by the administrator of the deceased. *Hudson* v. *Hudson,* 237 Ill. 9; *Grindle* v. *Grindle,* 240 id. 143.

The deceased had a stroke of paralysis some three or five years before he made the deeds in question, October 23, 1908, which affected his lower limbs and his tongue, so that up to the time he made those deeds his locomotion and his speech were slightly affected thereby so as to be noticeable to those who were intimately acquainted with him. In July and August, 1908, he had a very severe illness, and during that illness sent for Dr. Chestine and E. J. Hobbs, a notary public, and informed Hobbs that he was pretty sick and wanted to deed to his daughter, Nellie Marvel, forty acres of his land, to his son Joe forty acres, and to James Watson, an illegitimate son, forty acres. He dictated to Hobbs how he wanted the deeds made, what lands he wanted to deed to each one of the children, and had a life estate reserved to himself in all of the deeds. The deeds were duly and voluntarily executed as he requested, and the deceased handed the deeds to Hobbs with this statement: "I want you to keep them [the deeds] until I call for them during my lifetime or on my death deliver them to the parties to whom they are made." Hobbs took the deeds and placed them in a safety deposit box in a bank, and that same afternoon Nellie Marvel, the daughter, went to Hobbs with an order from her father for the deeds.

Standing on his promise to her father he refused to deliver her the deeds but delivered them in person to him that evening, and the deceased told him then that his children had become dissatisfied with the way the deeds were made and that he was going to make other deeds, and he then burned the deeds Hobbs returned to him. He then, or within a very few days thereafter, executed before Hobbs, as notary public, six other deeds for those lands,—one to each of said grantees, one to his son Charles, one to his wife and one to Bert Watson, another illegitimate son,— with stipulations in some of the deeds that his children, including Charles, should pay back to the deceased's estate certain moneys received by them, and those deeds were dictated by the deceased and placed in Hobbs' hands with similar instructions for delivery as to the former three deeds. The deceased again called on Hobbs for the six deeds, and in the presence of Charles, who was then complaining at the way they were made, the deceased burned them, remarking, "Now, by God, they are gone," and further saying he was going to do as he pleased, as he had worked for and got the land himself. Hobbs had known him intimately for ten or twelve years and lived within two miles of him. He testified to the foregoing facts and they are not disputed, and further testified that the deceased was then in his right mind and that he had every reason to believe that he understood what he was doing on those occasions; that his condition was normal and that there was nothing that occurred out of the ordinary in his actions or conversations.

On October 23, 1908, when the deeds in question were made, while living with his son Joe, the deceased sent for his family physician, Dr. M. D. Empson, and Dr. C. W. Pemberton, another physician and neighbor whom he had known intimately for years, and had them come out to his home to witness the deeds, with the expressed purpose, as he told Dr. Empson, that they should be able to testify as

to his competency to make the deeds should they afterwards
be attacked on the ground of his unsoundness of mind.  He
had W. W. Ramsey, a lawyer and notary public, draw up
the deeds.  Ramsey and Dr. Pemberton got to the house
first and talked with the deceased on various and common-
place subjects for an hour or more before Dr. Empson ar-
rived.  After Dr. Empson came the deeds were executed
by the deceased and witnessed by the two physicians, and
then all three of them remained there for supper.  Dr.
Pemberton and Ramsey were there three or four hours.
After they all got there the deceased asked his son Joe to
bring the deeds to him, and the deceased, then picking out
from the bunch the deed describing the lands, directed Ram-
sey to describe in the deed to Joe the home or north eighty
acres of his land and in the deed to Nellie the south forty,
and pointed out the respective tracts, and had a reservation
made in the deeds of a life estate for his own life.  He
then signed his name to the deeds, acknowledged them in
the presence of the witnesses, and handed his son Joe his
deed with the remark, "There she is; Nellie will be over
in the morning and I will give hers to her."  He stated in
the presence of the witnesses, as his reasons for making
the deeds, that he had been with Joe a good while and Joe
had been to a "right smart" of expense and trouble in
keeping his mother and that Joe and Nellie were to care for
him.  Joe took no part in the conversations, so far as ap-
pears from the evidence.  Ramsey and the two physicians
aforesaid testified to the foregoing facts, and further tes-
tified that they had known the deceased intimately for
twenty-five years or more, and that on that day, at the time
he executed the deeds, while weak physically, he was men-
tally sound, in his usual, ordinary, normal condition, and
comprehended what he was doing when he signed the deeds.
May Samuels was there also that day until a short time
before the deeds were executed, and testified that on that
day, and for a month before and after that time, the de-

ceased was normal mentally and capable of comprehending and transacting ordinary business, and that he was in such normal condition, mentally, during the entire year of 1908. About ten other neighbors living close to the deceased in Saline county and who had been very well acquainted with him for years, testified that he was of sound mind during the year 1908, and that they could notice no difference in him, mentally, during that year from what he was in former years, and their testimony was to the effect that he was mentally competent to transact business understandingly. On the other hand, Dr. Carter, his partner, Dr. House, and Nellie Marvel, and some two or three others who were also intimately acquainted with the deceased and had been for years, testified, in substance, that during his illness in 1908, and at other times during that year, the deceased was of unsound mind, and occasionally had delusions that he owned quite an amount of coal lands that he did not own at all, and that negroes and women were after him and trying to burn his coal, and some of the witnesses expressed themselves that he was mentally incapable of transacting ordinary business affairs intelligently. There is also much evidence in the record which ought not to be repeated in this opinion, tending to show that he grew weaker in body and mind and was insane, and finally became helpless physically and his mind almost a blank before he died.

We have studied this record carefully, and have concluded therefrom that the deceased was a very positive character and not easily persuaded to change his views or his mode of living; that he was also very rough and sometimes very vulgar in his manners, and at times in 1908, during his severe illness, and perhaps at other times prior thereto, was mentally unsound; that he had sane intervals, when he was competent to transact business, in 1908, and that after he went to Franklin county to live he became weak physically and was mentally incapable of transacting business two years or more before he died. The evidence,

however, clearly supports the finding of the court that the deeds in question were executed at a time when he was sufficiently sound, mentally, to execute deeds and to fully comprehend their effect upon himself and his grantees, and that the deeds in question are valid. Everything that he did and said in connection with the execution of these deeds shows that he thoroughly understood the business then in hand and comprehended its importance and the full effect of the deeds on all parties concerned therein. The mental faculties of a person may be impaired by disease or old age and yet he may have sufficient mental capacity to make a will or a deed. (*McLaughlin* v. *McLaughlin*, 241 Ill. 366.) He may be subject to delusions, but if they exert no influence on the grantor in the making of a deed he will not be incapacitated on that account to make a valid deed. (*Crosby* v. *Dorward*, 248 Ill. 471.) If the grantor in a deed has sufficient mental capacity to comprehend the nature of the transaction and the effect of his acts and can exercise his will with reference thereto, the deed will not be set aside for want of mental capacity. (*Kelly* v. *Nusbaum*, 244 Ill. 158.) When a deed is executed and delivered it then and there takes effect and transfers the title beyond the further power and control of the grantor. Statements of the grantor in disparagement of the title or in arraignment of the character or actions of the grantee, after the deed is executed and delivered, are not admissible to impeach it. (*Taylor* v. *Pegram*, 151 Ill. 106.) It was shown by the evidence in this case that the deceased told a number of persons, after he had executed the deeds in question, just how he had made them and that he was satisfied with them and that they were fixed just as he wanted them.

As the judgment of the county court is well supported by the evidence and there being no errors in the record in the admission of evidence, the judgment is affirmed.

*Judgment affirmed.*