(No. 17089.—Reversed and remanded.)
Rosie Decker, Appellee, *vs.* Albert Otto Decker *et al.*
Appellants.

*Opinion filed February 16, 1927.*

1. Deeds—*what is not ground for setting aside deed.* Senility, eccentricity, and even partial impairment of the grantor's mental faculties, are not grounds for setting aside a deed if the grantor had sufficient mind and memory to comprehend the nature and effect of the transaction and to protect his own interest.

2. Same—*when deeds will not be set aside.* Deeds executed by a widow making herself and her stepson joint tenants of property which she had held in joint tenancy with her husband will not be set aside where the weight of the evidence shows she was capable of transacting business and executed the deeds voluntarily after the nature and effect of the transaction were explained to her.

3. Same—*what necessary to constitute duress.* To constitute duress there must be such compulsion affecting the mind of the party executing the instrument that its execution is not his voluntary act, and the compulsion must operate and be effectual at the time the instrument is executed.

4. Appeals and errors—*when Supreme Court must reverse decision of chancellor on evidence.* While the Supreme Court will not, as a rule, disturb the chancellor's finding of facts where the evidence is conflicting, it must reverse the chancellor's decision where it is convinced, from a consideration of the whole record, that the evidence does not justify the decree.

Appeal from the Circuit Court of Cook county; the Hon. Ira Ryner, Judge, presiding.

William A. Cunnea, (John M. Humphrey, of counsel,) for appellants.

William Reeda, Charles E. Peace, and William Jaffe, (Amos W. Marston, of counsel,) for appellee.

Mr. Justice DeYoung delivered the opinion of the court:

Rosie Decker on October 31, 1922, filed her bill of complaint in the circuit court of Cook county against Albert Otto Decker and Richard P. Poulton to set aside two deeds

by which certain real estate was conveyed, and for an injunction restraining the defendants from entering upon the property or interfering with her enjoyment of the income therefrom. The complainant alleged in her bill that she was sixty-six years of age; that she married Conrad Decker on January 27, 1902, who then had a son, Albert Otto Decker, also known as Otto Albert Decker, over eighteen years old; that her husband was domineering, autocratic and brutal and had put her in constant fear of her life; that he was miserly, and she was compelled to work in order to provide herself with clothing and other necessities; that as the result of her efforts and frugality, she, with her husband, acquired the title in joint tenancy to lot 1 in Goode's subdivision of the east half of block 4 of Seller's subdivision of the southeast quarter of the northwest quarter of section 19, township 40 north, range 14 east of the third principal meridian, in the city of Chicago; that the ground was improved by two three-story brick houses,—one on the front and the other on the rear of the lot,—and that her husband died intestate on June 21, 1920. The complainant further alleged that Albert Otto Decker lived with her before and after his father's death but never contributed toward the expense of maintaining the home; that he is strong, stalwart, domineering and vicious, and since his father died dominated and threatened her continuously, so that she was in fear of her life; that under the abuse and ill-treatment of her husband and step-son her mind gave way, and as the result of the latter's undue influence, duress and threat that unless she gave him an interest in the property he would kill her, she executed an instrument on October 19, 1920, the character of which was unknown to her at the time but which she has since been informed was a warranty deed conveying the property to Richard P. Poulton; that she has no recollection of acknowledging the instrument but that it was made without consideration, and that she lacked contractual capacity at the time; that Poul-

ton on the same day by a warranty deed conveyed the property to her and Albert Otto Decker in joint tenancy, and that at the same time a contract was made between the joint tenants whereby, during her lifetime, Decker waived all right to the income from the property and agreed that she should receive it, and she, on the other hand, agreed to pay all taxes and assessments and to make all necessary repairs during the same period; that she had no recollection of the execution of the contract, and that when it was executed she was under the duress and influence of Decker. A temporary injunction restraining the defendants as prayed was granted on the day the bill was filed.

The answer of Albert Otto Decker specifically denied that his father and himself were autocratic, domineering or brutal, or that the complainant was ever in fear of either of them, or that Albert ever threatened her; denied that she was compelled to work in order to provide herself with clothing or other necessities; averred that he assisted in the support and maintenance of the complainant and his father; denied that she contributed anything toward the purchase or maintenance of the property in question, but averred that it was acquired by the application, in its purchase, of the proceeds of the sale of two properties which his father owned prior to his marriage to the complainant, together with a portion of Albert's earnings during a period of ten years; denied that threats, duress or undue influence led the complainant to execute the deed and contract on October 19, 1920, but averred that she was then capable of understanding and fully understood their nature and effect; that she knowingly executed the deed and contract of her own volition after consultation with a number of persons in order to do justice to Albert, who had contributed substantially one-half of the cost of the property, and averred that the income from the property was sufficient to afford her a comfortable living were it not for the fact that she permitted a relative to appropriate a consid-

erable portion of it to his own use, and that since Albert was enjoined from entering the premises she neglected to make repairs and permitted the property to go to waste.

The answer of Richard P. Poulton averred that on October 19, 1920, when the complainant entered into the agreement and made the conveyance, Decker did not exercise any force, undue influence or intimidation over her, but, on the contrary, that she was attended and advised by certain relatives and other persons who fully explained the meaning and effect of the instruments to her; that she was capable of understanding the transaction in which she was engaged, and that she voluntarily, knowingly and intentionally executed the deed and contract.

Replications were filed to the answers. After a hearing the court by its decree found that on October 19, 1920, the complainant did not have sufficient mental resistance to enable her to protect her own interests; that she was then under the undue influence of Decker, and that the deeds were made without consideration. The contract was canceled and the two deeds were declared void and ineffective, and the title to the property was confirmed in the complainant the same as it existed prior to the execution of the deeds. From that decree the defendants prosecute this appeal.

Albert Otto Decker, usually called Otto Decker, was the only child of Conrad Decker by a prior marriage. His parents owned two lots at the southwest corner of Waveland and Marshfield avenues, in the city of Chicago, improved by two buildings. They conducted a grocery store in the corner building and resided in the rooms to the rear of the store. The upper floor, as well as the building on the adjoining lot, they let to tenants. Otto Decker's mother died in 1901, when he was seventeen years of age. On January 22, 1903, his father married Rosie Decker, appellee. The adjoining property was sold in 1904 or 1905, and the father erected an additional building on the cor-

ner lot containing six four-room apartments. In 1913 the corner property was sold and the proceeds were applied toward the purchase of the property in question.

Otto Decker became a steamfitter in 1908 and was employed by the county of Cook for ten years. During that period he contributed a substantial portion of his wages toward the payment of the encumbrance on his father's property and other indebtedness incurred in its purchase and in defraying the cost and expense of its maintenance. His father died on June 21, 1920, and for about seven years prior to his death was severely afflicted with rheumatism and in consequence was unable to do much work. The title to the property had been held by his father and appellee in joint tenancy, and the latter became sole owner by her survivorship. Otto Decker was married in 1914, but his wife died ten months later, leaving an infant daughter. With the child he returned to his father and stepmother and continued to live with the latter after his father's death. Appellee cared for the child, and both before and after his father died Otto Decker made repairs to the property, assisted appellee and contributed to the support of the home. The income from the property, which averaged $125 per month, was collected by appellee. On October 19, 1920, she conveyed the property by warranty deed to Poulton, who on the same day re-conveyed it to appellee and her step-son in joint tenancy. A contract dated the same day was also executed by the parties, whereby it was agreed that appellee during her lifetime should receive the income derived from the property and pay the taxes and make the necessary repairs upon it.

Appellee was married twice. She left her first husband for his fault shortly after their marriage and returned to her mother. When she married Conrad Decker, in January, 1903, he was forty-nine and she was thirty-six years of age. She testified that Otto Decker, her step-son, lived with them, and while employed by the county he had the

habit of becoming intoxicated; that when he was in that condition he scolded her and threatened to kill her, although he never struck her, and that on one occasion he told her she could not eat from his table and threw her supper on the floor. She further testified that her step-son, speaking with reference to the property shortly after his father's death, said he did not wish to go with empty hands but wanted his share of his parents' property and that he would kill her if she did not sign papers to that end; that fearing the threat would be carried out, and accompanied by a brother of her deceased husband, Irving Naumann, her nephew, and her step-son, she went to the office of George Torpe, a real estate dealer, for the purpose of having the necessary instruments drawn, but that Torpe refused to have anything to do with the matter, and that the parties then proceeded to the office of Poulton, by whom the contract and deeds were drawn and in whose presence they were executed by the parties concerned. Appellee admitted that Otto Decker had said that an agreement should be drawn whereby she reserved the income from the property for life.

George Torpe, the real estate dealer, testified that he first met appellee when she came to his office with her husband to obtain a loan and that she was then of a nervous disposition and had a stare in her eyes. The loan was made and its payment was secured by a first mortgage on the property. He saw her again after her husband's death, when she told him that her step-son desired the title to the property, wanted her out of the house, demanded the rents and asked her to sign some papers. The condition of the title was discussed and the witness explained her rights to her. He next saw her when she came to make the conveyance in question. He advised her not to execute the deed, for he knew her condition and feared complications. He informed her he would have nothing to do with the matter and told the lawyer present that he would not

take the acknowledgment, for, he stated, it looked like coercion, and he did not believe appellee was in the possession of all her faculties at the time. Shortly afterwards she returned to his office to have some insurance transferred. Still later, on October 2, 1922, he lent her $500 on a second mortgage for the purpose of paying attorney's fees, and she then appeared to be competent to transact business. She made payments on the first mortgage from 1920 to 1924.

Johanna Peters, a sister of appellee, testified that before her sister married Conrad Decker she washed and worked as a servant girl, and that after her marriage she continued to do washing, had little food and hardly any clothing to wear. On cross-examination Mrs. Peters admitted that in 1921 she purchased certain lots from appellee, but that her sister was then mentally capable and knew what she was doing when she made the conveyance. Other witnesses who were acquainted with appellee testified that she did washing and other housework; that she was odd and had a habit of biting her finger nails; that she dressed poorly and not in good taste; that she ate improper food, such as candy, ice cream and pastry, before meals and suffered stomach trouble as the result; that she occasionally was silly, foolish, childish, absent-minded and restless, and that she had not sufficient mind to appreciate the nature of a transaction involving the disposition of her property. One witness testified that while she would not say that appellee was out of her mind, yet she was never smart in transacting business; that she never found anything to talk about and would repeat the same thing over and over again.

Four physicians testified on behalf of appellee. Dr. J. Thomas Pickerill first met her late in the year 1920, when he observed her, though not professionally. At that time she acted peculiarly and did not seem to be normal. He called to see her professionally in March, 1924, and found her in an hysterical condition; she spoke of things

that did not exist, of eating when she had not partaken of food, of suffering pain when there was no reason for its existence, she thought she saw people in the room when no one was present, and she would admit things and then deny them. Dr. Pickerill thought that she was suffering from food deprivation and anæmia, which had continued from the time he first saw her; that she was subject to fear and would be susceptible to the influence of those around her, and that she had dementia and lacked sufficient mental capacity to carry on the important transactions of life. Apart from anæmia the doctor found no organic trouble.

Dr. John S. Wallner, a physician in active practice for twenty years, treated the appellee in October, 1922, and she returned four or five times during the ensuing three months. She complained of gastro-intestinal disturbances and of headache. She had high blood pressure, which he attributed to senility; she was extremely nervous, looked toward the ceiling and did not answer questions directly. Dr. Wallner saw her again in April, 1924, when she had some severe gastro-intestinal symptoms and was unable to eat or sleep. He thought she was under-nourished, but he did not believe that the condition which he found in 1922 existed in 1920.

Dr. W. J. Hickson, whose qualifications were admitted, testified that he examined appellee on April 4, 1923; that he found her under-nourished; that she could not think and remember well, and while she answered simple questions she failed on complicated matters and recent memory tests. Apart from her mental condition the doctor did not find anything that was obvious, unless it was a thickening of the arteries. He concluded that she was suffering from senile dementia, but her case was not an extreme one. He expressed the opinion that if she never ate properly, if she was in the habit of washing and going without food, and her husband took her money from her, and if these facts obtained for a period of years, then her condition would be

progressive, and a person in such circumstances would not be of sufficient mental light to comprehend and understand the graver and more complex situations of life. Dr. Hickson considered that the transfer of a parcel of property to a third person with the understanding that the latter would re-convey it in joint tenancy constituted a transaction somewhat complicated for an inexperienced woman of appellee's age, suffering from senile dementia, and that if a woman divested herself of her property without consideration she would very readily yield to another's influence.

Dr. H. I. Davis, engaged in the practice of medicine since 1892, superintendent of the Cook County Psychopathic Hospital for nine years and a specialist in nervous and mental diseases, examined appellee on December 4, 1924, and stated that her heart showed a myocardiac condition; that the right auricle was enlarged and there was a slight murmur; that the pulse rate was 100 and the blood pressure was 158; that there was a twitching of the face muscles and some stuttering when beginning a sentence; that she repeatedly bit her finger nails; that she could not explain the object of her visit but said she was in court because they wanted to take her property; that her memory for recent events was fair but for past events it was poor; that she possessed little general information. It was Dr. Davis' opinion that the patient had been feeble all her life; that her condition had been aggravated by senile changes, and that she was more feeble-minded in 1924 than in 1920. He was asked an hypothetical question on direct examination which included some of the testimony adduced concerning appellee's sickness as a child, her under-nourished condition, the ownership of the property in question, the execution of the instruments under the circumstances shown, and he answered that in his opinion appellee was not capable of understanding the nature of the transaction under review. On cross-examination the hypothetical question was extended to include other questions and appellee's answers

324—30

thereto, and Dr. Davis was asked whether it was his opinion that she was not of sound mind, and he answered affirmatively. On a further question which assumed that the person answered correctly, without hesitation, Dr. Davis testified that he would pronounce the person sane, but he added that the assumption could not properly be made, because some of appellee's answers were incorrect. He expressed the opinion that appellee was not of sound mind or capable of understanding the nature of the transaction in question.

Two medical experts testified in behalf of appellants. Dr. Dennis P. Russell, who had made a study of mental diseases for many years and had been a member of the psychopathic commission under several judges of the county court of Cook county and had examined thousands of cases of senile dementia, testified that he had observed appellee on the witness stand, and found that, while she was of a nervous disposition, the color of her face was good and the expression of her eyes was clear, and it was his opinion that she was mentally normal at the time and not more susceptible to suggestion than the average woman of her age. Dr. Russell stated that it would be almost impossible for one to examine a woman fifty-six or fifty-seven years of age and say that she was incapable of transacting business four years before; that if the body were under-nourished and the person had fainting spells for a considerable period and had attained the age of fifty-seven years, these conditions might have some effect upon the mentality, but that the physical condition of the average human being in the ordinary case had nothing to do with his mental condition.

Dr. James Whitney Hall, whose experience in the treatment of mental diseases covered a period of thirty years, testified that appellee exhibited no symptoms of dementia in any form; that there was nothing to indicate that she was at all disturbed; that she answered questions in a normal way, and that her physical condition had absolutely

no bearing on her mental capacity. He testified that one of the characteristics of senile dementia is that it becomes progressively worse, and after it has existed four or five years,—often sooner,—deterioration sets in, and practically all of the characteristics of dementia of that type are manifested so clearly that they can be observed from the conduct of the individual. Dr. Hall added that it would be absolutely impossible for a woman fifty-two or fifty-three years old to have senile dementia and not show any of its effects at the age of fifty-six or fifty-seven years, because if she had it, even in an incipient stage, it would show boldly within three to five years.

Albert Otto Decker, the principal appellant, testified that he was employed as a steamfitter, and that for ten years he gave the major portion of his wages to his father, who applied the money on the purchase price of his property, in reduction of the mortgage upon· it and in payment of its maintenance charges; that appellee had neither money nor property when she married his father; that he was about to purchase a two-flat building late in 1914 when his father and appellee dissuaded him from his purpose because they wanted him to continue to live with them, and that after his father's death he had a conversation with appellee in which she again requested him to remain with her, and said that the title to the property would be placed in herself and the witness in joint tenancy, for the reason that it had been so vested in his father and herself. Irving Naumann, her nephew, who since was killed in an accident, was present and approved this arrangement. Appellee, Naumann, Anton Decker, appellant's uncle, Richard P. Poulton, an attorney at law, and the witness, went to George Torpe's office for that purpose. Torpe was told that they came to transfer the property· to appellee and her step-son in joint tenancy. He objected, stating that he had the property listed for sale, and cited an instance of a controversy between a mother and her son which arose out

of the collection of rents. The witness told Torpe that there would be no trouble on that account because he did not want any part of the rent, and that he would assist appellee all that he could. Torpe then said that he had no stenographer and suggested that they go to a lawyer. He asked appellee whether she knew what she was doing, and she answered that she did; that the matter had been explained to her and that she was perfectly willing to make the conveyance. The same parties then proceeded to Poulton's office, where the deeds and contract were drawn. Naumann told Poulton that the witness had put considerable money into the property. Poulton explained the arrangement to appellee, and she said that she was perfectly satisfied with it. The contract was read to her and she approved it. The deeds and contract were then executed and the deeds were filed for record. Decker further testified that he made repairs to the property at various times; that he bought food, groceries and other supplies for the home; that he gave appellee money from time to time, and that she did not go out to do washing, although she occasionally of her own volition assisted certain of her relatives; that she never lacked food but always had an ample supply in the house; that in the fall of 1920 the witness drank some liquor which made him sick while seated at the table; that he pushed the plate to one side and it fell to the floor, but that he never threw food from nor denied appellee the right to eat at the table; that he never scolded, chased, beat or threatened her, and that he never threatened to kill her unless she conveyed the property to him; that he never requested her to give him the property, but that she and her nephew, Naumann, proposed that the conveyance be made in joint tenancy,—the arrangement later carried into effect; that appellee listed the property for sale and collected all the rents and that he never inquired what she did with the money so collected, and that she transacted, and was capable of transacting, business affairs.

Anton Decker, the uncle of Otto Decker, testified that appellee and her husband lived happily together; that her step-son made repairs about the house and gave his father money; that in October, 1920, appellee came to his house and requested him to accompany her that day because she was going to put the title to the property here involved in herself and Otto Decker in joint tenancy. They stopped at her house, where they found the step-son and Naumann. The parties proceeded to Torpe's office and appellee informed him of her purpose. Torpe said he did not like the arrangement, because in a similar case he had trouble about the rent. She replied that she would receive all the income for life. He answered that he could not do the work because he did not have a stenographer, and advised them to go to a lawyer. The same persons then went to Poulton's office. Poulton informed appellee that she was the sole owner of the property as the title stood and inquired whether she knew what she was about. She answered she did, and that she wanted her step-son to get his share but that she retained the income during her lifetime. The instruments were drawn and read and Poulton again inquired whether she understood the transaction, and upon her assurance that she did the deeds and contract were executed.

Richard P. Poulton, a lawyer, was called to Torpe's office on the day in question. He had not met either appellee or her step-son but was acquainted with Naumann. The witness was told that the property was owned by appellee and that she wished to transfer it to herself and Otto Decker in joint tenancy, reserving the income to herself for her life. Torpe suggested that the arrangement about the income should be put in writing, because he had experienced trouble in a similar transaction where such an arrangement was verbal. Torpe stated that he had no stenographer, and the parties then proceeded to the office of the witness. He explained to appellee the meaning of joint tenancy and told the parties what the effect of the proposed transfer would

be. Appellee insisted that the transfer be made, and the instruments were drawn and executed. She understood the nature of the transaction. Later, in 1922, appellee was a witness in a divorce case in which her step-son was the complainant and in which the witness was his solicitor. She then spoke of the property, said everything was satisfactory and that her step-son was a great help to her about the building. They were very friendly at that time.

Wilhelm E. Tennyson testified that he was a tenant from March, 1920, until November 25, 1924; that Conrad Decker, the father, was a fair-minded man, who was always at home, worked around the house and smoked his pipe on the back porch; that he never saw the son intoxicated or abuse or threaten appellee, and that the son also worked about the building; that appellee told the witness that her step-son was a good boy, who did all he possibly could to assist her and contributed $25 a week to support the home, and that she held the property in joint tenancy with him. The witness testified that he never saw appellee bite her fingers, that she never made a mistake in giving a rent receipt, and that he deemed her capable of transacting business.

Bernice Naumann lived in the building seven years and saw appellee and her step-son practically every day. She testified that appellee was thrifty and economical. Her health was good and she was capable of transacting business affairs. The witness was well acquainted with Otto Decker and never saw him intoxicated.

Peter J. Feyereisen, a tenant from June 2, 1920, until February, 1923, saw Otto Decker bring home various kinds of food and work about the building and never saw him intoxicated. Appellee and her step-son lived together in harmony. The witness did not notice that appellee was nervous, and when he paid rent to her she knew what she was doing, and she was like the average woman of her age.

Alfons Naumann, a nephew of appellee and a tenant for seven years, testified that he often conversed with her and never saw her do any washing for others; that on an average he had one meal a month in her home and the meals were excellent; that he never saw Otto Decker intoxicated and never heard him threaten or abuse appellee; that she collected the rent and signed the receipts herself; that she was capable of transacting business in 1920, and that she never did anything that indicated that she was not in her right mind.

One or more other witnesses well acquainted with the parties testified that appellee and her step-son apparently lived together happily; that they always had ample food; that they never saw the step-son intoxicated or abuse appellee, and that she was capable of transacting business and understood the transaction in which she was engaged when she placed the title to the property in joint tenancy in herself and her step-son.

The question to be determined is whether the evidence shows that the execution of the instruments in question was procured by undue influence and duress exercised by Otto Decker. There is neither allegation nor contention that undue influence was exercised by virtue of any fiduciary relationship existing between the parties. The charge is, in substance, that appellee in her impaired condition of mind, caused by the previous ill-treatment of her husband and step-son, was compelled by the direct acts of the latter to execute the deeds and contract.

The evidence that senile dementia is progressive was uncontradicted, and if the appellee's mental condition was weakened by that disease when the instruments under review were executed it must necessarily have been impaired at the time of the hearing, more than four years later. Johanna Peters, appellee's sister, purchased certain lots from her in 1921 and testified that she was then men-

tally capable and understood the transaction. These lots were sold and conveyed after the joint tenancy here attacked was created. Torpe, the real estate dealer, testified that he advised appellee not to execute the deed because he knew her condition and feared complications, and did not believe that she was in the possession of all her faculties at the time, yet he made a first mortgage on the property shortly before, when, as he said, she was of a nervous disposition and had a stare in her eyes. Immediately after the conveyance was made he transferred the policy of insurance on the property at her request, and nearly two years later he lent her $500 on a second mortgage to pay attorney's fees. Moreover, from 1920 to 1924, he received payments from her on the first mortgage. His conclusion that her mental capacity was impaired on October 19, 1920, is hardly justified by his subsequent business relations with her and has no basis in the facts adduced.

Dr. Pickerill met appellee late in 1920, although not professionally, and he thought she acted peculiarly and did not seem to be normal. He did not see her again until March, 1924, and the peculiarities he then observed can have little, if any, bearing upon her mental capacity nearly three and a half years earlier. Dr. Wallner, who first treated appellee in October, 1922, two years after the conveyance was made, stated that he did not believe the condition which he found in 1922 existed in 1920. Drs. Hickson and Davis examined the appellee,—the former on April 4, 1923, nearly two and a half years, and the latter on December 4, 1924, more than four years, after the deeds and contract were executed. Both stated that her condition was progressive and more aggravated in 1924 than in 1920. Other witnesses concluded that appellee was incapable of comprehending the nature of a transaction involving the disposition of her property because she dressed inexpensively and in poor taste, partook of delicacies instead of substantial food, repeated things, lacked information, was not smart

in the transaction of business, and occasionally was silly, foolish, childish, restless and absent-minded. Obviously, these characteristics, some of which, at least, are exhibited by many persons mentally competent, afforded no sufficient basis for the conclusion drawn by these witnesses.

There was countervailing evidence both by lay and professional witnesses called by appellants. Dr. Russell concluded from his observation of appellee at the time of the hearing that she was normal mentally, and he stated that it would be practically impossible for one to examine a woman fifty-six or fifty-seven years of age and say that she was incapable of transacting business four years earlier. To Dr. Hall, who also observed appellee at the hearing, she exhibited no symptoms of dementia in any form. Senile dementia, he asserted, appeared boldly within three to five years after its inception, and it would be impossible for a woman fifty-two or fifty-three years of age to be so afflicted and show none of the effects four years later. A number of witnesses, including four tenants of the property from three to seven years, who had seen appellee often and paid rent to her, testified that she exhibited no impairment of mental capacity and that she was capable of transacting business.

Upon all the evidence it cannot be said that appellee's mental capacity was impaired to such an extent that she was unable to comprehend and understand the nature and effect of the transaction in which she was engaged when she executed the deed and contract in question. While she was uneducated and eccentric, yet the evidence clearly shows that she was capable of protecting her interest in a business transaction and that she fully understood the nature and effect of the conveyance in joint tenancy, with the reservation to herself, by the contract, of the income for life. Senility, eccentricity, and even partial impairment of the grantor's mental faculties, are not ground for setting aside a deed if he had sufficient mind and memory to comprehend

the nature and effect of the transaction and to protect his own interest. *Crosby* v. *Dorward,* 248 Ill. 471; *McLaughlin* v. *McLaughlin,* 241 id. 366; *Baker* v. *Baker,* 239 id. 82; *Sears* v. *Vaughan,* 230 id. 572; *Bordner* v. *Kelso,* 293 id. 175; *Campbell* v. *Freeman,* 296 id. 536; *Sharkey* v. *Sisson,* 310 id. 98.

The next inquiry is whether the charge that the execution of the instruments was procured by duress exercised by Otto Decker has been sustained. The only direct evidence to that effect is, first, the testimony of appellee that her step-son threatened to kill her if she did not convey his share of the property to him, and, fearing that the threat would be carried out, she made the conveyance; and second, the statement by George Torpe that he refused to take the acknowledgment of the proposed deed because to execute it looked like coercion. So far as the threat is concerned, it was made shortly after Otto Decker's father died and weeks before the conveyance was made. Notwithstanding the threat she continued to live with her step-son. She called on Anton Decker, her brother-in-law, and asked him, as well as Irving Naumann, her nephew, to accompany her to Torpe's office to have the deed executed. After they arrived there the proposed conveyance was discussed, and she answered Torpe's objection with reference to the rent by stating that she reserved the income for life. Later, when Poulton in his office informed her that she was the sole owner of the property and explained what the effect of the proposed deed in joint tenancy would be, she answered that she wanted her step-son to have his share but that she retained the income during her lifetime. Naumann, whom she consulted, approved of the arrangement. Two years after the conveyance had been made appellee appeared as a witness for her step-son in his divorce suit and told Poulton that everything was satisfactory and that her step-son was a great help to her about the building. Her conduct denies compulsion in the execution of the

deed and contract, and Torpe's statement about coercion is necessarily unsupported.

To constitute duress there must be such compulsion affecting the mind of the party executing the instrument that its execution is not his voluntary act. The compulsion must operate and be effectual at the time the instrument is executed. (*Smith* v. *Henline,* 174 Ill. 184; *Hintz* v. *Hintz,* 222 id. 248; *Leonard* v. *Burtle,* 226 id. 422; *Sears* v. *Vaughan, supra; Huston* v. *Smith,* 248 Ill. 396; *Mitchell* v. *Mitchell,* 267 id. 244; *Valbert* v. *Valbert,* 282 id. 415; *Harris* v. *Flack,* 289 id. 222; *Burandt* v. *Burandt,* 318 id. 218.) The facts in evidence not only show appellee's competency to execute the instruments in question, but also their voluntary character. That dissatisfaction has since arisen cannot now affect their validity. There was no want of consideration for the conveyance. Otto Decker had made substantial contributions to the purchase and maintenance of the property. He was the only child, and while there was no certainty, in any legal sense or by virtue of any legal right, that he would receive a share of his father's property, yet he was not a stranger seeking to divert it from its natural and legitimate channels. A settlement of property rights is not uncommon and the settlement effected was not unusual in its character. The widow retained the income for life, which obviously was her principal concern, while the title was vested in both in joint tenancy.

Finally, appellee invokes the rule that where the case is tried before the chancellor, who saw and heard the witnesses, and the evidence is conflicting, a reviewing court will not disturb the chancellor's finding of facts unless the decree is clearly against the weight of the evidence. That rule has been announced in many cases, but it has also been held that when this court, from a consideration of the whole record, is convinced that the evidence does not justify the decree, our duty to reverse it is clear. (*Burandt*

v. *Burandt, supra; Sharkey* v. *Sisson, supra; Bordner* v. *Kelso, supra; Smith* v. *Kopitzki,* 254 Ill. 498.)    In our opinion the decree rendered in this case is clearly against the weight of the evidence.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to dismiss the bill for want of equity.

*Reversed and remanded, with directions.*