(No. 24501.—

MILDRED JOHNSON, Admx., *et al.* Appellees, *vs.* JOHN A. LANE, Appellant.

*Opinion filed June 15, 1938.*

GLENN RATCLIFF, (M. LACHLAN CRISSEY, of counsel,) for appellant.

CHIPERFIELD & CHIPERFIELD, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here on direct appeal to review a decree of the circuit court of Fulton county setting aside a deed and for partition of the real estate therein described and other real estate.

The complaint alleges that Clinton C. Lane, now deceased, who was the father of defendant and complainants,

was, prior to March 23, 1935, seized in fee simple of certain described real estate in the city of Canton; that on that date he, by a deed executed without consideration, conveyed that property to the defendant, his son John. The complaint sets out that Clinton C. Lane died April 20, 1935, seized of certain other real estate described in the complaint, and leaving the defendant and complainants his sole heirs-at-law. The complaint also alleges that the defendant caused the deed to be prepared and, by the exercise of undue influence, procured the execution thereof at the time when the mental condition of his father, as he well knew, was such that he did not have sufficient mind and memory to comprehend the nature and effect of his act and to exercise his own will. The complaint also charges that defendant's father sought the return of the deed, and that defendant refused. It may be here stated that no evidence was offered of this latter charge and further consideration of it is unnecessary.

The complaint also charges that, for a period of six months prior to the date of the execution of the deed, Clinton C. Lane was a man addicted to the excessive use of intoxicating liquors and, as a result of this habit and the infirmities incident to his age of seventy-one years, he was, at the time of the execution of the deed, a man whose mind and memory was so impaired that he was incompetent to comprehend the nature of his act or to exercise his independent will, and that defendant, for more than six months prior to the making of the deed and for the purpose of inducing his father to convey the property to him, endeavored to induce his father to believe that complainants were about to have a conservator appointed for him; that they were unfriendly to him, and were conspiring to get hold of his property. No proof was offered that he made any such representations to his father.

It is also charged that defendant procured supplies of intoxicating liquors for his father's use to keep him in an

intoxicated condition for the purpose of obtaining undue influence over him, and that defendant threatened him that, unless he conveyed the real estate to him, complainants would procure the appointment of a conservator. No evidence was offered tending to support these allegations.

The complaint alleged that, by reason of the facts therein stated, the deed was void, and prayed that it be set aside and that partition be had of that property, as well as of other lands owned by Clinton C. Lane in his lifetime.

The defendant answered the bill denying all charges concerning his conduct. Eighteen lay witnesses testified for the complainants, eleven witnesses testified for the defendant, including the family physician of the deceased. Sixteen of the complainants' witnesses expressed their opinion that Lane was not of sound mind. Of these, Lawrence Fisher is a son of complainant Stella Fisher; Mildred Johnson is one of the complainants, a daughter of the deceased; Jesse Fisher is the husband of Stella Fisher, complainant; Rodney Johnson is the husband of complainant Mildred Johnson, and Stella Fisher is one of the complainants. These witnesses all testified to frequent intoxication of the deceased. Some of them testified that the deceased had declared he had to have liquor. Some of them testified that he said he drank as much as one to two quarts per day. These witnesses also testified to various acts and omissions on his part indicating forgetfulness, and all gave as their opinion that, during February, March and April, 1935, he was not capable of transacting ordinary business. They all testified that following the death of decedent's wife in January, 1935, he was more given to the use of intoxicants and seemed less capable of attending to ordinary business of life.

Howard Scholes, a nephew of deceased, testified that he attended his aunt's funeral and that his uncle, the deceased, told him he had lost a purse and thought that his son John, the defendant, had stolen it. This witness testified

that the purse was later found in a bureau drawer. He testified, also, that his uncle had said that John abused him and he didn't know what he would do without his daughters, the complainants. He testified, also, that he had seen his uncle once or twice since the funeral and that he was drunk both times; that on one of these occasions his uncle took the witness and his wife to lunch with him and paid his own bill, only; he also testified that about the middle of March his uncle told him that Stella and Mildred, the complainants, had turned against him. This witness was of the opinion that the deceased was not of sound mind and memory and was not capable of transacting ordinary business after his wife's death. He testified that his uncle had written him several letters, but that all of them had been destroyed but one, which he thought he could produce. The record shows that he later wrote the clerk that he was unable to find the letter. He had never transacted any business with his uncle.

Alice Scholes, a niece of the deceased, testified that she had noticed a change in the deceased after the death of his wife; that he would start talking and change the subject; that she did not talk with him on any business matters but that he stated he did not know what he would do without the girls.

McClelland Divers testified for complainants that he lived directly across the street from the deceased and about the middle of March he saw him drunk on two occasions. He expressed no opinion as to his mentality.

Irene Price testified for complainants that she lived for a time in the Lane residence, across the hall from the room occupied by deceased; that he was intoxicated every day; that his son John was there for two or three weeks before she moved away from the building; that sometimes deceased was unable to hold a connected conversation and that she talked with him very little. From her observation she did not think him a man of sound mind and memory.

She testified, on cross-examination, she paid her rent to him and that part of the time he took care of the furnace.

Carroll Owens testified that on one occasion he saw the deceased fall when he was carrying ashes, but he went to him and found his condition was due to intoxication. This witness expressed no opinion as to his mentality.

Charles W. Wilson, Willard Sebree, Bertha Hunt and Guy Coleman, each testified, in effect, that they had noticed a change in the physical and mental condition of the deceased after his wife died; that he seemed to become weaker mentally and physically, and they did not think deceased was of sound mind and memory sufficient to transact ordinary business.

Irene H. Eklon, an employee of the National Bank of Canton, testified that she had charge of the safety box department of that bank; that about February 2, 1935, the deceased rented a safety deposit box; that on March 14 he came to her to open the box; that on that day he was under the influence of liquor; that they transferred his box from the basement to the first floor; that, between March 14 and April 13, he made five trips to the box; that she waited on him each time he was there and that on March 22 he told her he wanted to revoke the deputyship of Mrs. Johnson, whom he had made his deputy when he rented the box. She testified he was intoxicated each time he went to the box. Although she testified to having transacted business with him at that time, and relates no difficulty on his part to understand and carry on those transactions, she gave the opinion he was not wholly sound and capable of transacting ordinary business. She testified that she had no personal contact with him except in the bank, and that no one was with him when he came there.

Lyle James testified for complainants that he lived for a time in the house of the deceased until the middle of February, 1935; that he had seen deceased both sober and intoxicated and that he was apparently weaker after his wife's

death. He thought a man of that sort was not capable of transacting ordinary business but that the only business he had with him was to pay rent to him.

Ida Sebree testified that at times the deceased did not talk connectedly; that she never heard him make any statement about his ability to transact business; that, in her opinion, he was not a man of sound mind and memory during the last several months of his life. She thought he knew his children; that he often called by telephone and said he was lonesome. She testified that he came to her house five or six times a week and was capable of understanding how to play cards.

Elmer Sebree testified that the deceased frequently came to his house; that he did not think complainants Stella and Mildred went to the home after John came. He testified also that the deceased sometimes got "mixed up" while playing cards and expressed the opinion that, during the last two months of his life, he was not capable of transacting ordinary business.

Mildred Johnson testified that her father told her he drank two quarts of liquor a day and had to have it. She testified that she assisted in dismantling the house and helping her father get settled in his room, and that for two weeks after her mother's death deceased took all his meals at her house; that her brother John, the defendant, left the house the night after his mother's funeral and said all he cared for in the house was gone. She testified to noticing a physical and mental change in her father's condition after her mother's death; that John started coming to his father's house about the second week of March and that, thereafter, her relations with her father, which before had been friendly, were changed; that she noticed a change in her father's feeling toward her and her sister, Mrs. Fisher. She testified that she had talked with John about her father's mental condition about the first of March and that John told her he thought she should have a conservator appointed;

that he wasn't capable of taking care of his affairs; that, about the middle of March, John told her she didn't need to come to the place any more and that they didn't need her. She testified that her father gave her twin beds and some personal things at the time she helped to dismantle the house, and later demanded that they be returned; and that the first she knew of the deed was when she saw in the newspaper that it had been recorded. She testified to having seen her father on March 22 and 23 and that he was intoxicated. On cross-examination, she testified she had a dispute with her father about twin beds; that she refused to give him one of them and that her father said if she didn't bring it over he would get out a writ for it, and that she did not return to her father's house after their conversation about returning the bed. Rodney Johnson, her husband, corroborated much of Mildred Johnson's testimony, but, upon his statement that he had heard of these facts from his wife, much of his testimony was stricken from the record.

Stella Fisher testified that after her sister, Mrs. Johnson, went to Florida in February, her father came to her house nearly every day until John returned; that he appeared to become weaker mentally and physically after his wife's death, and that he would talk to himself. At times he would try to straighten up but would go back again to the habit. The complainants and members of their families testified that when he came to their house he usually drove his car there and drove it away alone.

Defendant took the stand and attempted to testify concerning conversations which complainants, Mrs. Johnson and Mrs. Fisher, had testified as having taken place between the witness and the defendant, some of which were in the presence of the deceased. The court refused to permit him to testify on those matters. This is assigned as error. The rule is that where plaintiffs sue as heirs, the defendant, though an heir, is competent to testify to con-

versations and transactions testified to by such plaintiffs, even though such conversations were held in the presence of the deceased. (*Roche* v. *Roche,* 286 Ill. 336; *Vail* v. *Rynearson,* 249 id. 501; *Calkins* v. *Calkins,* 220 id. 111.) It was error to deny defendant the opportunity to testify concerning the conversations referred to.

Dr. J. C. Simmons testified for the defendant that he had seen the deceased several times between his wife's death and April 7, when he was seized with his last illness; that he frequently saw him at the Elks Club and had conversation with him. On April 7 Lane became ill with laryngitis and the witness was called to treat him. Between that date and April 11, deceased told him he had some difficulty with his daughters over a pair of twin beds and that he was greatly peeved over the matter and stated that Mildred and Stella had taken a large amount of property from the home and that he was sorely grieved over the removal of the property; that the deceased told him that he had gone to Mrs. Fisher's to get some garden tools and her son assaulted him, and deceased had further said that he didn't want anyone by the name of Fisher or Johnson to have any of his property; that he had made a deed to John for the property in which he was living. This doctor testified that he never saw the deceased when he thought he was intoxicated; that, in his opinion, he was a man of sound mind and memory prior to the time of his seizure on April 16. Lane died April 20. On cross-examination, he testified that from an examination of Lane and his observation of him he was of the opinion that he did not drink two quarts of whisky per day; that no one could drink that amount of whisky and be in the condition he was in.

Charles H. Divilbiss, the scrivener who drew the deed here in question, testified that he resided about one hundred feet from the home of the deceased; that he saw him almost every day within the last two years of his life; that he transacted business with him, insured his property and

that the last thing he did for him was make the deed on March 22; that, on that day, deceased came to his office and said: "Charley, I want you to make a deed for me." Witness said he told him he would have to write it out longhand because he could not use a typewriter; that Lane said that it was all right, it was as good as any; that Lane gave him a copy of the deed and told him that all he had to do was to copy it. He told him, also, that he was going to Peoria that evening and when he came back he would get the deed. He told him to make the deed to John A. Lane. This witness further testified that Lane returned to his place the next day; that John was with him; that he took the deed and looked at it and said it was all right; that the witness' bill was $2 and that Lane tendered him a ten-dollar bill but, as change could not be made, said he would pay him sometime later. Lane signed the deed in his presence and in the presence of one Earl Groover, a notary, who took Lane's acknowledgment. This witness testified that about a week later he saw Lane across the street and Lane called to him and said: "Charley, I want to pay you." He came across the street and paid him. He also testified that at that time he had a conversation with him about candidates who were running for office in the spring of 1935; that one of the candidates was a woman and that Lane expressed his opinion that a woman was not a proper candidate for supervisor. He testified it did not enter his head, the day Lane came to have the deed drawn, that he was intoxicated; so far as he could see he was all right on that day and on the day he came to sign the deed, and that he considered him a man of sound mind and memory and capable of transacting ordinary business.

Groover, the notary, testified that he had known the deceased for about thirty years; had business transactions with him; that he notarized the deed in question; that when Lane came in he said to him: "Hello Earl, you are just the man I am looking for; I want you to notarize this

paper," and that they had a conversation discussing topics of the day. This witness also testified that during the last three months of Lane's life he saw him occasionally at the Elks Club; visited with him a number of times and that when he took his acknowledgment he did not think he was under the influence of intoxicating liquor. He was of the opinion that Lane was a man of sound mind and memory at that time and capable of transacting ordinary business.

Mrs. Marjorie Lane, the divorced wife of the defendant, testified that about April 5 she was at the house of the deceased and talked with him and that he told her he wanted John to have the house because each of the girls had a home and John did not; that on the morning of March 23 he and John came to her house in Peoria and ate breakfast with her daughter Genevieve; that she was unable to stay and have breakfast with them as she had to go to her place of employment. Her daughter, Genevieve Lane, testified that she saw the deceased on the morning of March 23 at her home in Peoria; that he was not under the influence of liquor; that they discussed her work and that he asked her to come over to Canton and see him. In her opinion he talked very sensibly.

W. G. Kepler testified for the defendant that he formerly worked for the deceased and was at his house for dinner a short time before he died; that deceased told him he had always thought a lot of his daughter Mildred but that they had had some misunderstanding, and he was going to fix things so that she would get nothing. This witness testified that Lane was not under the influence of liquor when he talked with him and that witness frequently went to his house to carry out ashes for him and do other odd jobs. This witness expressed his opinion that, during February, March and April, 1935, deceased was a man of sound mind and memory and capable of transacting business.

Pearl Kepler, wife of W. G. Kepler, testified that the deceased was at their house on the Sunday before he was

taken sick; that he told them about his daughters going against him and that he had fixed things so they would get nothing. She was of the opinion that the deceased was of sound mind and memory.

Walter Williams testified that he saw the deceased a short time before his last illness and talked with him for about fifteen minutes; that he had known him for a considerable period of time and noticed no change mentally or physically, although he wasn't as "spry" physically as he had been years before. Freda Williams testified to the same effect.

Among other witnesses who testified, from frequently seeing the deceased and having business transactions with him, that he was mentally competent during the months of February, March and April, were Frank J. Veara, who lived at the house of the deceased, saw him on an average of three times a day and testified that deceased spoke to him frequently of his daughters turning against him; Robert Knox, who lived two doors west of deceased and saw him almost every morning, and O. W. Hipple, proprietor of a meat market where deceased was a customer.

Complainants argue that the finding of the chancellor must be sustained unless it is manifestly and palpably wrong. It is a rule that a chancellor's findings of fact will not be disturbed unless the decree is clearly against the weight of the evidence, but when it appears from a consideration of the entire record that the evidence does not justify the decree, it is the duty of this court to reverse it. Here, there is no direct denial of the evidence of any witness concerning facts stated. *Decker* v. *Decker,* 324 Ill. 457; *Burandt* v. *Burandt,* 318 id. 218.

The complaint, as we have seen, charges undue influence and the existence of a fiduciary relationship between the defendant and his father, the grantor in the deed. It is necessary, in weighing the evidence, to determine whether undue influence was used and whether a fiduciary relation-

ship existed, since the *quantum* of proof required to sustain the complaint filed, is affected by determination of those questions.

To establish undue influence one charging it must show more than a mere suspicion. The evidence of such undue influence must be clear and cogent, leaving the mind satisfied with the truth of the charge. (*Valbert* v. *Valbert,* 282 Ill. 415.) In this case the record is barren of any statement or act on the part of the defendant, or any circumstance tending to show that he attempted to persuade or influence the making of the deed. The fact that he was with his father at the time of the making of the deed, does not, of itself, tend to establish undue influence. The record is clear that he took no part in the conversation with the scrivener but that the directions were explicit and were given by the grantor. Statements of the grantor as to why the deed was made, tend to show not only such reason but tend, also, to negative undue influence. The fact that parties may be in such a relationship that undue influence may be exercised, does not afford that clear and cogent proof of such exercise, in the absence of some fact tending to establish that the defendant attempted to persuade or influence the making of the deed. We are unable to agree with the chancellor that the record in this case establishes undue influence by the character of proof required by the rule.

Was a fiduciary relationship shown between the defendant and his father? The evidence shows that the defendant resided with the grantor for a short time prior to the making of the deed and until his father's death, about four weeks later. It also shows that he made one trip to Peoria with his father and that he was present at the time the deed was drawn. There is no evidence that he transacted any business for the grantor or that the latter depended upon him. On the other hand, the evidence tends strongly to show that the grantor exercised his own judgment and that when he had business to be transacted he attended to it him-

self. This is clearly indicated by the evidence of the bank employee concerning his visits to his safety deposit box and by the fact that he terminated the deputyship of his daughter, Mrs. Johnson, one of the complainants. There is no evidence that the defendant in any way induced such action. The possibility that he may have done so does not supply proof that he did. The complainants testified that the defendant had said they were not wanted at their father's house. This, according to their testimony, occurred after their father and Mrs. Johnson had a misunderstanding about a bed which she had taken from his home.

While John was frequently with his father the last few weeks of his life, there is nothing in the record to indicate any relation of confidence or trust between them other than would ordinarily exist between a father and his son. There is no evidence that the defendant acquired a dominion over his father or any control of his business, or that he exercised or attempted to exercise any influence in the conduct of his business. His presence at the time the deed was made did not raise any presumption of a fiduciary relationship, as such is known in the law. A fiduciary relationship exists where there is special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. It exists where confidence is reposed on one side and resulting superiority and influence is found on the other. (*Niland* v. *Kennedy,* 316 Ill. 253; *Chance* v. *Kinsella,* 310 id. 515; *Campbell* v. *Freeman,* 296 id. 536; *Baker* v. *Baker,* 239 id. 82.) Where it is sought to establish a fiduciary relation by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion. (*Neagle* v. *McMullen,* 334 Ill. 168; *Winkelman* v. *Winkelman,* 307 id. 249; *Pillsbury* v. *Bruns,* 301 id. 578.) Relief against a fiduciary relationship is predicated upon the doctrine of constructive trust and is awarded on the theory that the defendant holds title

as trustee for the grantor. To establish that relationship and constructive trust, the proof must be clear and convincing. (*Hogg* v. *Eckhardt,* 343 Ill. 246; *Fish* v. *Teninga,* 330 id. 160; *Rubin* v. *Midlinsky,* 321 id. 436.) Such relationship being established, the burden is on one benefiting by the deed to show that it was procured fairly and without the exercise of undue influence. We are of the opinion that the evidence in this case was not of that clear and convincing character requisite to establish the existence of a fiduciary relationship.

If the decree is to be sustained it must be upon proof of the allegations that the mind of the grantor at the time of the execution of the deed was, as result of excessive use of intoxicating liquors and infirmities incident to old age, so impaired that he was mentally incompetent to comprehend and understand the nature of his act in making and executing the deed.

Appellant argues that the chancellor erred in holding that the test of mental capacity of the deceased is whether he was competent to protect himself in a trade or sale, whereas the test to be applied in a case of this kind is whether the grantor had the mental capacity to make a will. The test of capacity of a father to make a deed to his child is that he have sufficient mind and memory to comprehend the nature and effect of his act and understand the nature of the business in which he was then engaged, and that he was exercising his own will. If the record shows such capacity, the deed is valid. (*Harrington* v. *Travis,* 349 Ill. 606; *Sharkey* v. *Sisson,* 310 id. 98; *Bordner* v. *Kelso,* 293 id. 175; *Sears* v. *Vaughan,* 230 id. 572.) In the last cited case this court held that impairment of memory by reason of advanced years does not, of itself, indicate a lack of mental power to dispose of property. Impairment of mind incident to old age and disease, or due to habitual intoxication, will not render the grantor's deed to his son invalid

if such grantor is able to understand the nature and effect of the business he is engaged in and is exercising his own will. No greater degree of mental capacity is required in such a case than is required to make a will. (*Sharkey* v. *Sission, supra; Essary* v. *Marvel,* 274 Ill. 576.) The burden of showing that the grantor was mentally incapable of making a deed was on complainants. (*Campbell* v. *Freeman, supra.*) Unreasonable prejudice of a grantor against his relatives is not ground for setting aside a deed, unless it can be explained on no other ground than that of an insane delusion. *Carnahan* v. *Hamilton,* 265 Ill. 508; *Noone* v. *Olehy,* 297 id. 160.

An examination of the testimony of the opinion-witnesses shows that many of them did not state the opportunities they had for observing the deceased, nor relate conversations or transactions with him from which they might form an opinion. Such opinions are of little weight as evidence. The presumption is that a grantor of a deed was of sound mind when he executed it. (*Stephens* v. *Collison,* 330 Ill. 48.) There is no rule of law which requires a parent to distribute his property equally among his children. He may prefer one and cut off another, with or without good reason or any reason, and the fact that Clinton C. Lane gave a part of his real estate to his son does not constitute evidence of mental weakness. We are satisfied, from the reading of the entire record, that complainants failed to sustain the burden cast upon them to show that their father was mentally incapable of making a deed or that the deed was procured through undue influence of the defendant. The finding of the chancellor was against the manifest weight of the evidence.

The decree of the circuit court, in so far as it set aside this deed and ordered partition of the property described therein, is erroneous, and is reversed; in so far as it ordered partition of property not described in the deed, it is affirmed.

*Reversed in part and affirmed in part.*